GREAT WEST MIN. CO. v. WOODMAS OF ALSTON MIN. CO.
ET AL.

1. PRACTICE IN COURTS OF EQUITY — RIGHTS FORFEITED BY LACHES OF PARTIES.— Courts of equity will only grant relief in case the application therefor is made without unreasonable delay. The strongest equity may be forfeited by laches, or abandoned by acquiescence.

2. FLUCTUATING CHARACTER OF PROPERTY TO BE CONSIDERED IN DETERMINING LACHES — MINING CLAIMS.— Where the subject-matter of a controversy is the right to unpatented mining property, the uncertain and fluctuating character of the property will be considered in determining the question of laches.

3. STATUTE OF LIMITATIONS SUPERIOR TO COURTS OF EQUITY.— The statute of limitations fixes a limit beyond which the courts cannot extend the time, but within this limit the peculiar doctrine of courts of equity will prevail.

4. VOID AND VOIDABLE JUDGMENTS.— As a rule, a judgment of a court of general jurisdiction is void in no case except when it appears from the record itself that the court, in pronouncing it, acted without jurisdiction.

*Appeal from District Court of Arapahoe County.*

Messrs. L. S. DIXON and H. B. JOHNSON, for appellant.

Mr. HUGH BUTLER, for appellees.

MR. JUSTICE HAYT delivered the opinion of the court.

The facts in this case, as they appeared previous to the last trial, are sufficiently set forth in the former opinions

filed herein, and will not be again repeated.   See 12 Colo.
46.   The judgment of the district court of El Paso county
in favor of appellees was then reversed, and the case re-
manded to that court, leaving counsel and the court be-
low to pursue such course in relation to additional parties
and further proceedings as they should be advised.
Thereafter, by consent of parties, a change of venue was
taken to the district court of Arapahoe county, and a
new trial had.   Upon this trial a large amount of addi-
tional evidence was introduced, upon which evidence,
considered with that previously taken, the court below
found the issues for the defendants, and dismissed the
bill.

To review this action of the court the case is brought
here by appeal.   In the district court the judge presiding
at the trial, Hon. O. B. Liddell, filed a written opinion,
with a copy of which we have been favored by counsel.
In it the learned judge reviews the case at length, in con-
nection with the authorities, and arrives at the conclu-
sion that the appellant had been guilty of such unreason-
able delay in asserting its rights that it ought not to be
heard now.

An examination of the new evidence introduced dis-
closes that it was largely directed to the question of
laches.   Upon the case as made upon the former appeal,
this court was of the opinion that laches sufficient to de-
feat a recovery did not appear.   Mr. Justice Gerry,
delivering the opinion of the court, then said, in refer-
ence to Purmort, and the service of process upon him,
that he "concealed, or neglected to inform the company
of the fact of such service."

And again, upon rehearing, it was said:   "The appel-
lant was not informed of the false return, or of the un-
authorized appearances of Gwynn, in time to proceed by
motion to correct the same in the court where the attach-
ment suits were pending, and had no notice of the sale
of its real property until the time for redemption had ex-

pired, but, as soon as it did obtain information of the
fraud perpetrated upon it, it was diligent in employing
counsel and commencing this suit; and, as this suit was
brought within less than three years from the time of
the perpetration of the fraud complained of, and within
less than eighteen months from the time of the execu-
tion of the sheriff's deeds, and promptly upon the dis-
covery of the fraud that had been practiced upon it, we
think the appellant was chargeable with no such laches
as should bar it from maintaining this action."

The additional evidence occupies over two hundred
pages of the type-written transcript, and was deemed
sufficient by the trial judge, after giving due weight to
the evidence taken upon the first trial, and also to the
former opinions of this court, to radically change the
result then announced.   With this new evidence the case
is now before the court in a different aspect from that in
which it appeared upon the first appeal.  It is now shown
that A. W. Kellogg was not only general agent of the
appellant company, but that he had the entire manage-
ment of the corporate business.   The then secretary of
the company, Mr. A. S. Whitaker, who has at all times
been active in prosecuting this action, swears in refer-
ence to the Great West enterprise:  " It was a pet scheme
of Mr. Kellogg, and he attended to everything."   Again
he refers to Kellogg as "having the supreme manage-
ment."

The nature and scope of Mr. Kellogg's authority in the
premises becomes important, in view of the fact that he,
in the interest of the Great West Company, arranged
for the institution of the Perkins suit in advance of
Moynahan, who was threatening suit, in order that the
working of the mine should not be interfered with.   It
appears that, in accordance with an arrangement previ-
ously entered into between Kellogg and the workmen at
the mine, upon ascertaining from Moynahan, at Denver,
that he was about to institute suit, Kellogg, by telegraph,

directed the Perkins suit to be brought. These telegrams, two in number, were directed to Frank D. Howe, who describes himself as Kellogg's "closest friend." The originals were not produced upon the trial; but, their loss having been shown, Mr. Howe testified as to their contents as follows: "The first telegram — the body of the message — was, 'Have Grogan commence suit in Perkins' name.' Then — there was a cipher used for Moynahan's name —'Moynahan means to make us trouble.' Then there was something followed, in the way of 'See Purmort,' or something of that kind." Again: "I was a little mystified by the expression 'Grogan,' and I telegraphed Mr. Kellogg: 'Does Grogan mean Gwynn, and also the amount due the men?'" To this telegram the witness testifies that he received an immediate answer, in substance as follows: "Yes, at once; followed with the amounts due the men." The witness further testifies that the Gwynn referred to was George R. Gwynn, an attorney resident at Alma.

That an attachment was to be issued in such suit is admitted, but it is claimed by the appellants that it was understood that such attachment would only be levied upon the personal property, while the witnesses for appellee testify that no such understanding was had. We attach little importance to this conflict, however; it now clearly appearing that the proceedings set on foot by Kellogg, acting for the company, actually resulted in the attachment and sale of its real property. The appellants' claim that such proceedings were carried to a greater extent than anticipated by it cannot have much weight in a court of equity as against the rights of *bona fide* purchasers deriving title through the sale made under the judgment rendered in such action. The evidence now also strongly tends to show that the three principal officers of the plaintiff company — Kellogg, Pomeroy and Whitaker — had notice as early as 1883 that its real estate had been attached and sold in the

Purmort and Moynahan suits. That Kellogg had such notice is shown beyond dispute; and here it may be said that it is a significant fact that plaintiff failed to call Kellogg as a witness in its behalf, although he was present, sitting by, at the trial. Kellogg's bias in favor of plaintiff is shown by his letters introduced in evidence. He was certainly well informed in reference to these matters; and his silence, under the circumstances, tends to create the belief that his knowledge was not of such a character as would benefit the plaintiff.

Upon the former appeal it was not shown that the company had notice of the sale of its real estate in time to avail itself of the statutory right of redemption. It is now apparent, however, that it had such notice in ample time. It is in evidence that the company was trying to raise money with which to redeem before the time for redemption should expire. Appellant not only failed to redeem, but allowed the years 1884 and 1885 to pass without making any effort to do the annual assessment work upon any of these claims, although such work was required by the mining laws under which they were claiming the property. From the time the sheriff's deeds were executed and delivered, in 1884, until this suit was commenced, in 1886, they permitted these defendants and their grantors to remain in the undisputed possession of the property without protest, permitting them to develop the same under the belief that they had acquired a good title thereto. No fraud is imputed to the defendants. By the silence of plaintiffs they were lulled into purchasing and making expenditures upon this property that they otherwise might not have made, although it is true they ultimately made a profit as the result of the hazard incurred.

. Under these circumstances, we are to determine whether the court erred in dismissing the bill on account of the laches of the plaintiff. It is a familiar principle that courts of equity will only grant relief in cases in

which the application therefor is made promptly and without unreasonable delay, whatever may be the merits of the controversy. The necessity for the application of this rule to cases in which the subject-matter of the litigation is the right to unpatented mining property, the only value of which arises from the precious metals contained therein, is apparent. The value of such properties is always uncertain, and usually purely speculative. This case furnishes an illustration of the uncertainty of such values. At the time the attachments were levied the properties were considered of little or no value. The ore extracted would not pay the expenses of taking it out. In fact the suits were instituted for labor performed and supplies furnished in working the mine; the indebtedness arising on account of the necessary expenses exceeding the amounts realized from the sale of all ores extracted. Afterwards, by the labor and expenditure of these defendants and their grantors, the property was shown to be of great value; the ore extracted yielding a large net profit to those in possession and working the same. Although the original proceedings were irregular, should this plaintiff, after years of delay, be now allowed to reap the benefit of the expenditure and hazard incurred by others, and which plaintiff was unwilling or unable to take, becomes a pertinent inquiry in this connection. Upon this question the authorities are certainly with the defendants. Thus, in *Peebles v. Reading*, 8 Serg. & R. 493, it is said:

"Laches and neglect ought forever to be discouraged. There is in chancery always a limitation. Nothing will bring a court of equity into action but a pure equity, and a reasonable diligence. The strongest equity may be forfeited by laches, or abandoned by acquiescence."

In *Sullivan v. Railroad Co.* 94 U. S. 811, the following is quoted with approval, and credited to *Smith v. Clay*, 2 Amb. 645: " Nothing can call forth this court into activity but conscience, good faith and reasonable dili-

gence.  Where these are wanting the court is passive, and does nothing.  Laches and neglect are always discountenanced; and, therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court."

In the case of *Attwood v. Small*, 6 Clark & F. 356, the lord chancellor was of the opinion that relief should be refused in reference to mining property for the reason that a delay of six months had intervened between the time at which the complainants acquired knowledge of the alleged frauds, and the bringing of the action.

In the case of *Ernest v. Vivian*, 33 Law J. Ch. 517, upon the subject of laches, the vice-chancellor says: "The subject-matter of this suit is the right to mines.  Mining operations are of a particular character.  They are an uncertain and speculative and hazardous adventure. * * * There is also a continual and increasing risk; for a mine profitable to-day may to-morrow become worthless.  Similar observations have repeatedly been made by other judges.  Now, if a person has a just right to mines of which he is not in possession, as against those who are in possession of and working them, and if he claims to be the rightful owner (the person in possession being aware of his rights or supposed rights), if such owner, not being prevented by fraud or concealment, stands by for a long period of time whilst those in possession are working the mines, this court will not lend him any assistance. * * * It is not equitable to allow him to wait till it is ascertained that the persons in possession have succeeded or may have been ruined, and if the subject result in profit, to ask to put that in his pocket; if in loss, to repudiate the loss.  It is not necessary, even if possible, to prove whether he acted from premeditated design or carelessness."

In the case of *Pollard v. Clayton*, 1 Kay & J. 480, relief was refused for the reason that complainant had delayed eleven months after suit might have been brought,

and the court also refused to allow an amendment setting up excuses for such delay.   The court says:

"Instead of that, the plaintiff waits eleven months. and then, at last, the bill is filed.   I do not look out of the bill, as the case made has not done so; but it is enough for me to say that coal, like all other articles of constant use and constant sale, is a commodity fluctuating from day to day in its market price, and, during the interval which has elapsed, there may have been every possible variety of price, of rise or decline, and the parties are not now in the same position.   *   *   *   It is not equitable — and in this court, especially, it would be improper — to give relief of that description after such a period of delay as in this case has been allowed to occur between the time when the plaintiff was first in a position to file a bill, and the time when he took upon himself to file it.   Having regard to the circumstances of delay alone, the court ought not to give relief after laches of this description."

In *Oil Co. v. Marbury*, 91 U. S. 592, Mr. Justice Miller, speaking for the court, says: "The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells.   Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for $1,000 as its fair value may, by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much every day.   The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.

"While a much longer time might be allowed to assert this right in regard to real estate whose value is fixed, on which no outlay is made for improvement, and but little change in value, the class of property here considered,

subject to the most rapid, frequent and violent fluctuations in value of anything known as property, requires prompt action in all who hold an option whether they will share its risks or stand clear of them."

Further quotations from the authorities are unnecessary, but the following cases will be found in support of the views quoted: *Hart v. Clarke,* 19 Beav. 363; *Jennings v. Broughton,* 5 De Gex, M. & G. 139; *Kinney v. Mining Co.* 4 Sawy. 447; *Williams v. Rhodes,* 81 Ill. 588.

Under our statute, bills for relief on the ground of fraud must be filed within three years after the discovery by the aggrieved party of the facts constituting such fraud and not afterwards. We cannot, however, give this statute such a construction as will permit a party in all cases to stand idly by until the limitation of the statute has nearly run, and then claim that, by virtue of the statute, he is excused from all laches. The statute fixes a limitation beyond which the courts cannot extend the time, but within this limit the peculiar doctrine of courts of equity should prevail.

We shall not extend this opinion. If points have been discussed by counsel that have not been passed upon in some one or more of the opinions in this case, it must not be thought that for that reason they have been overlooked. A careful consideration of the whole case convinces the court that the judgment of the court below should be sustained.

*Affirmed.*

### ON REHEARING.

PER CURIAM. The petition for a rehearing in this case is so ably and exhaustively urged in the printed brief, and argument filed in support thereof, that it has been thought due to counsel to file this additional opinion in overruling the same.

Counsel in this argument say: " It is as true now as it was upon the first appeal that notice of the judgments

and sales is not brought home to the company." Let us see as to this.   An examination of the new evidence discloses that the witness Duffy mailed early in September, 1883, the following letter, duly addressed, to Kellogg, at Denver, postage prepaid: "Sept. 5th.   A. W. Kellogg, Esq.— My Dear Sir: The personal property of the Great W. M. Co. was sold yesterday by the sheriff.   Prices were pretty good for a sale of that kind.   The real estate was bought in for just enough to cover the judgments. A party wished me to ascertain who owns the Shamrock on Mt. Cameron.   He wants to do the assessment work. You attended to this last year.   All well.   Yours truly, THOMAS W. DUFFY."

In the absence of evidence to the contrary, we must assume that this letter was received by Kellogg, in due course of mail, within a few days after it was posted; and, by the evidence of Bartley, it is shown that Kellogg was fully informed by him of such sale upon the 21st day of the month of November following.

William H. Hammond testifies: "I saw A. W. Kellogg in the office of the Great West Mining Company, in Denver, on May 31, 1883.   Mr. Whitaker, who was also connected with the Great West Mining Company, was present.   A. W. Kellogg was general manager of the Great West Mining Company at the time.   I had a talk with them at that time, telling them if they could raise $5,000 to lift those judgments they would have a good thing. Kellogg replied that they could raise no money.   The judgments referred to were those claims assigned to John T. Perkins and the Moynahan claims.   Kellogg also said that Pomeroy tried to raise the money, but could not.   I asked them for money due me at that time, which was due me for work on the mine from January 18, 1883, up to May 29, 1883.   What money was due me prior to January 18, 1883, was included in the Perkins suit."

In considering this evidence, it is to be borne in mind that Kellogg and Whitaker were two out of the three

directors of the defendant company,— the one general manager, and the other secretary and treasurer,— occupying the same offices, with constant communication with each other. Can it be said that the trial judge was not warranted in finding that Whitaker, at least, as well as Kellogg, had notice of the sales of real estate, notwithstanding the denial of Mr. Whitaker? Pomeroy is also shown to have had knowledge of these attachment suits as early as the fall of 1883. The evidence shows that the personal property brought less than $500 at the sheriff's sale. That this was a fair price, under the circumstances, must be presumed. The Perkins and Moynahan judgments, with costs, aggregated something over $3,000. Is it reasonable to believe that the officers of the company could have expected these judgments to have been paid from the proceeds of the personal property alone?

Kellogg, in all his acts, appears to have been governed by a desire to advance the interests of the Great West Mining Company; and we can find no foundation in the record for the charge made by counsel that he "leagued himself with the creditors of the company, and aided them, either actively or passively, in the work of fraud, concealment and spoliation." It was only after he had failed to secure funds with which to pay the creditors of the company, and when Moynahan was on the eve of commencing suit by attachment for his claim, that he arranged for the laborers to attach the company's property as security for the amount due them in the development of the mines. By pursuing this course, it appears that Kellogg entertained the idea that the men would continue this work; and, as long as the work of development continued, there was a chance for the discovery of richer mineral, in which event the company might be benefited by such new discoveries, if made before the sale, or even before the expiration of the time for redemption. Under the circumstances, we cannot say that

his course was not prompted by a desire to benefit the company of which he was the general manager.

It is also said in support of the petition for a rehearing: "There is not a syllable of testimony to show that any officer of the company had any knowledge, notice or suspicion that these judgments were either fraudulently procured, or rendered without jurisdiction, until just about the time suits were brought." It does appear, however, that Kellogg, the general manager of the company, caused the Perkins suit to be instituted; and we think the testimony was sufficient to warrant the trial court in finding that both he and Whitaker knew the attachments had been levied upon the property; that the property had been sold as the result of such attachment proceedings; and that the purchasers were in possession, claiming and exercising the rights of owners. Here was certainly sufficient notice to demand further inquiry, and such inquiry would undoubtedly have disclosed all the facts in reference to the service upon Purmort, and the appearance of Gwynn. If such inquiry was not in fact made, it is quite immaterial whether the failure to make it resulted from negligence or design, or was rendered unnecessary by reason of the officers having full knowledge. They must be taken to have had notice of such facts as they would readily have ascertained, had they used ordinary diligence.

In the opinion recently filed in this case the following language is to be found: "Defendants were lulled into purchasing and making expenditures upon this property which they otherwise might not have made." And counsel say: "We fear some one must have dreamed all this, for there is absolutely nothing in the record to justify such statement." In this statement counsel is certainly in error. Although it may be proper, for some purposes, to separate the new from the old evidence, it is also proper to consider the whole; and, doing this, we find it to be practically conceded that the Wilsons paid $2,000

as the first instalment upon the purchase price of this property, and they certainly had taken nothing out at that time.   In addition to this, we have the uncontradicted testimony of Alfred H. Wilson to the effect that they (the Wilsons) had paid out about $13,000 in working the mine since Gwynn turned it over to them, in addition to paying $8,194, the original purchase price of the property; and it was agreed between counsel that, if Randall W. Wilson was on the witness stand, and the same questions were propounded to him that have been propounded to his brother, Alfred H. Wilson, his answers would be substantially the same.

In view of this testimony, and the manner of working the mine,— its remoteness from the ore market,— is not the court warranted in concluding that at least a portion of the $13,000 was expended upon the property before any sum could have been received from the sale of the ore extracted, although such ore netted them a profit of about $3,000?   And there can be no doubt, under the evidence, that whatever sum was in fact so expended was expended upon the faith the Wilsons had in the title procured by them from the purchasers at the sheriff's sale.

Counsel say that this court "has given effect to evidence that was overwhelmingly contradicted by other evidence (which is not alluded to) and to have assumed conditions of fact against all the evidence bearing upon the questions."   We have endeavored to demonstrate by the record that there is sufficient evidence to support the findings of the trial court in favor of the defendant, and to this end have, it is true, more particularly alluded to evidence tending to warrant the judgment.   It was the peculiar province of that court to judge of the credibility of the witnesses appearing before it, and determine the weight to be attached to the testimony of each. Its opportunities for so doing were far better than, ours, and, in obedience to well-settled rules, we must accept

its conclusions where the evidence is conflicting; it not appearing that the court misunderstood the evidence, or misconceived either its scope or effect, or that it acted unreasonably in determining its weight. There are upwards of one thousand folios in this record, and we cannot undertake to discuss in detail all the evidence contained therein.

It is maintained that the general subject-matter of this cause is of legal as well as equitable cognizance, and that, therefore, the court must be governed by the statute of limitations applicable to an action at law, instead of by the equitable doctrine of laches; the argument being that plaintiff could attack these judgments in an action of ejectment at any time within five years, and that it cannot be cut off from relief in this equitable action in a shorter time on account of its laches. To permit the plaintiff to attack these records, regular upon their face, in an action for possession of the property, under the code, in the nature of ejectment, would be to allow the judgment of a court of record to be destroyed in an action in which the pleadings would give no notice of any claim that the judgments were invalid. We cannot concede that this may be done. Public policy, as well as the spirit of the code, require that the opposite party shall be apprised by the pleadings of the nature of the defect relied upon to defeat such judgments. As a rule, a judgment of a court of general jurisdiction is not void unless it appears from the record itself that the court in pronouncing it acted without jurisdiction. A judgment rendered without bringing the defendants into court is not for this reason void, but voidable only, unless the failure to obtain jurisdiction over them appears from the record. *Allen v. Huntington*, 16 Am. Dec. 702; Freem. Judgm. § 116; *Owens v. Ranstead*, 22 Ill. 161; *Ridgeway v. Bank*, 11 Humph. 523; *Hahn v. Kelly*, 34 Cal. 391.

That this distinction has been kept constantly in mind

by this court is quite apparent from the qualification expressed in each instance in which the judgments are alluded to in the former opinions of this court as being " absolute nullities " under certain conditions.

The proceedings being regular upon the record, the judgments can only be avoided upon extraneous evidence. For the reasons given in the opinion recently filed, in our judgment, appellant, by its laches, is now shown to be precluded by well-settled rules from showing the invalidity of the judgments. The petition for a rehearing must be denied.

*Rehearing denied.*