Bissell, P. J.,
delivered the opinion of the court.
Where there is any suggestion of laches in the record, bills for specific performance are governed so absolutely by their own peculiar conditions as to require more than the usual consideration of the facts which make up the history of the controversy.
Disregarding the differences, whether significant or immaterial, between the original bill and its various amendments, the complaint charged generally the execution of an agreement on the 27th day of July, 1882, between the owners of the Little Giant and Bonnybel mining claims, for the division of the area in conflict between the two properties. The *392 agreement was executed, as to all the parties but one of the owners of the Bonnybel, by attorneys connected with the pending litigation, to wit, by Taylor and Ashton, as attorneys for the owners of the Little Giant, and by Henry Moody, as attorney for Moore and Daniel. Thomas Bracken, the other owner of the Bonnj'-bel, is alleged to have signed it himself. Since this was the only agreement charged, the complainants must manifestly recover upon proof of its sufficient legal execution. It will be assumed that what has been stated accords with the proof, since the trial court so found. We do not conceive that we are called upon to consider the evidence touching this matter. The proof about it and respecting the contents of the paper is in irreconcilable and irrepressible conflict. This circumstance relieves us of all responsibility to review the testimony. As to this question, the case is brought' fairly within the rule which declares the judgment of trial courts on conflicting questions of fact conclusive upon the appellate tribunal. Reserving for the present any expression of our opinion concerning the legal proposition suggested by these matters, we will state the contents of the record touching the conduct of the complainants with respect to the assertion or the enforcement of their legal and equitable rights. Out of the volumes of the present record, we have been able to cull a mass of facts about which there is no essential or serious conflict, which are of great and controlling significance.
West Aspen mountain rises above the plain which makes the valley at the junction of Roaring Fork and Maroon creeks. At its base lies the city of Aspen, which in the past has been largely dependent for its prosperity upon the ■ riches taken from that mountain. It is in a manner separated from the balance of the spur which continues eastward to the main range by Vallejo gulch, from which it rises by a very sharp ascent to the west and south. Near the crest of the ridge is the apex of the vein, on which a large number of valuable claims are located. The Little Giant and the Bonnybel are in this vicinity. The statements concerning the locations *393 are only given as matters of description, for, as the record stands, the plaintiffs can predicate no rights upon the basis of the seniority or character of their title. The Little Giant was located in January, 1880, and the Bonnybel iri the July following. The claims were so staked on the ground that there was a conflict between the two claims of a little upwards of three acres. The Little Giant’s course was northerly fifty-eight degrees and thirty minutes east, and the Bonnybel ran northerly thirty degrees and twenty-two minutes east, and the claims were so located that the northeast corner of the Giant was a,t what may be called the westerly side line of the Bonnybel. The Giant’s end line was at right angles to its side line and three hundred feet long, and the other side line ran from, it at right angles. This description shows that the area in conflict was a triangular piece of ground, amounting to a little upwards of three acres. Neither claims at the point of conflict produced much mineral for many years, and their value was very problematical.
On the 13th of January, 1881, Moore, Daniel and Bracken, as the owners of the Bonnybel, applied for a patent and filed their application in the land office at Leadville. Notice of their application was duly published, and on the 26th- day of May, 1881, a receiver’s receipt was issued to them by the government. The publication expired on the 18th of March. The owners of the Little Giant filed an adverse claim, under the rules and practice of the land department of the government, some four days prior to the expiration of publication. Up to this point what was done accorded with the federal statutes and the practice of the land department in reference to the acquisition of title to mining claims and the assertion of conflicting rights. From this point it is very important to observe the proceedings of the complainants or their grantors with reference to the maintenance of their alleged title. It is a well known fact in mining countries that the filing of an adverse claim in a land office is ineffectual to protect asserted rights, unless the claimant continues to assert his title by the institution' of an adverse suit within *394 the time specified by the statute. After an adverse claim has been filed, the applicant can neither obtain his receipt nor his patent without first producing in the land office a certificate from the court having jurisdiction to determine the question of title to the land involved that there is no suit pending. Such receipt was produced in the land office at Leadville, and Moore, Daniel and Bracken were permitted to enter the land, pay for it, and get the government evidence of title. At this time the land was located in what had been Gunnison county, but which became a part of the county of Pitkin by an act of the legislature of 1881.
The testimony shows that in the prosecution of their alleged rights, the owners of the Little Giant sought to institute a suit in Gunnison county, and mailed a complaint to the clerk of that court for the purpose. It is not made to appear what became of that suit,- except it is inferentially shown the complaint was probably lost in the mails in the attempt to send it across the range in the month of March, 1881. At this date the weather was inclement, the range almost impassable, and the attorneys for the Giant, in their efforts to protect the owners whom they represented, filed another complaint in the office of the clerk of the district court of Lake county. This paper was filed in ample time, but beyond the filing of the pleading and the issuance of the summons the parties took no steps thereunder. There is some claim that since the district court was one of general jurisdiction, an adverse suit might be instituted in Lake county as well as in the locus of the property, subject only to the rights of the defendants to transfer the case on application. The record presents no such question. The suit was never prosecuted, the summons was never served, although one of the defendants was always a resident of Lake county, and the case is in no manner brought within the principle of those decisions which hold that where a receipt has been issued after the dismissal of a suit and prior to its reinstatement, a revival of the suit and its subsequent prosecution to judgment will invalidate the receiver’s receipt, or possibly *395 any patent issued by the government. A very different question would have been raised here if the plaintiffs had had their process served in the Lake county suit, and ultimately recovered a judgment establishing their title. It would then have become a question as to what force should be given to the receipt, and whether, if the patent had subsequently been issued by the government, the patentees could not in that suit or in some other been held as trustees for the successful litigants. The failure to prosecute that suit to judgment or to take any steps in it destroys its value as an adverse suit, and no legal consequences flow from the simple fact of its commencement.
Shortly after the entry of the Bonnybel, an ejectment suit was begun in Pitkin county, which had been constructed out of the territory formerly constituting Gunnison county, wherein-the land was located. This suit is known in the case as suit No. 10, evidently having been the tenth suit brought in the new county. To render the opinion a little more intelligible to others than the residents of Colorado, it may be stated that under our code the venue of a suit concerning land should be laid in the county where it is situate. It was long a much mooted question whether the district court sitting in any other county could take jurisdiction of a suit respecting the title to land. It was probably in recognition of this doubt that the owners of the Giant brought this ejectment suit in Pitkin county. This suit No. 10 is laid as part of the basis of the one before the court. Speaking generally, it was an action in ejectment in the form of an adverse suit, which set out the location, the title of the owners of the Little Giant, and sought to recover possession of the area in conflict between the two claims. It is difficult to understand why the suit should have been brought in that way, since no title acquired by location alone would be available against the government title then held by the Bonnybel and evidenced by their receipt. A plea based on the receiver’s receipt would have been an absolute answer to the plaintiffs’ claims, and must have defeated that suit. Speculations as to the reason *396 of its institution, are unprofitable. A judgment on demurrer was entered in tliat suit. This was afterwards set aside as to Moore and Daniel, but stood for some time as to Bracken, until the proceedings which will be soon stated.
Matters remained in statu quo until the July term of the Pitkin county district court, when negotiations were entered into between the attorneys and the respective parties looking to the settlement of the controversy. Just what the controversy was or what there was to adjust, when there was only a valueless ejectment suit pending, and the defendants had a receiver’s receipt, is a little difficult to apprehend. However, negotiations were had between the parties, and resulted in the preparation of a written contract to be executed by the respective claimants. What that contract was and by whom it was signed are matters which we shall neither discuss nor decide. The rights of the parties can be settled without such a decision, and wherever it is possible, we always prefer to accept the conclusions of the trial court on conflicting testimony; or, if that be not feasible, to rest our decision upon some indisputable proposition of law which is conclusive of the matter. Witnesses are not before us, the testimony is in cold type, and we are not satisfactory triers of questions of fact which have been sustained and controverted by living witnesses. A paper of some'sort was drawn up by one or more parties. One was prepared by Moody, who was the attorney of Moore, Daniel and Bracken, and signed by Moore and Bracken. This paper was produced in court, and is termed the Moody agreement. The other paper, which the complainants insist was prepared by another attorney, they assert was signed on behalf of the owners of the Little Giant by Taylor and Ashton, their attorneys, and by Daniel and Moore, through the signature of Moody, acting on their behalf. Whether the one or the other is of little moment if the judgment of the court upon the legal proposition be accurate. Whatever may have been the fact concerning the preparation or execution of either one or both of these papers, the following day, the 27th of *397 1 July, 1882, suit No. 10 was disposed of. The judgment as to Bracken was vacated and the suit dismissed as .to all of the defendants. Four days afterwards, the patent to the Bonnybel, covering the area in conflict, was issued by the government.
It is well here to state that, according to the contentions of the complainants, the agreement provided that upon the issuance of the patent the owners of the Bonnybel should deed to the Little Giant claimants a strip of ground seventy-five feet wide and one hundred and fifty odd long, running parallel to the westerly side line of the Bonnybel claim, together with the right of dumpage on seventy-five other feet below and parallel to the strip to be deeded. The complainants concede the preparation of the Moody contract, and its execution by Moore and Bracken personally, whereby, as owners of the Bonnybel, they agreed, in the adjustment of the contention, to deed to the owners of the Little Giant the first seventy-five foot strip.for dumping purposes only, reserving all mineral rights in the ground over which the easement was to run. It is thus manifest that the nub of this controversy respects the character of the title which was to be conveyed and the mineral rights of the grantors and grantees thereunder; for long afterwards, within this identical strip, the present defendants uncovered and developed an enormous body of valuable ore, from wrhich they derived great gains, and for which the complainants here seek to compel them to account.
After the dismissal of suit No. 10, in July, 1882, nothing was done by.either party until the present suit was brought, on the 5th of August, 1884, by the grantors of Hagerman, Young and Belles. The patent was recorded in Pitkin county, but on what date is not disclosed. At all events, it was issued on the 31st day of July, 1882, and from that time onward has been in the possession of the owners of the Bonnybel. According to the testimony of some of’the complainants’ witnesses, this strip of land was regarded as very valuable, and likely, by development, to show the existence *398 within it of a portion, at least, of the apex of the vein in which they were otherwise interested, and possibly the presence of large quantities of silver bearing ore. The matter was the subject of considerable discussion between the owners of the Giant and their attorneys. McEvoy, who was one of the Giant people, was repeatedly at Taylor and Ash-ton’s office, prosecuting his inquiries concerning the carrying out of the agreement which they claim was made. Neither this opinion, concerning the value of the property, nor the inquiries of the clients, ever led to any investigation concerning the patent. All parties knew that the receiver’s receipt had gone in May, 1881, and, in the natural course of events, the patent would of necessity follow it in a more or less brief period. For some inscrutable reason, knowledge that the patent was issued did not come to the plaintiffs or any of their grantors until more than two years after the government had transmitted it to the local land office in Leadville. ■ Taylor and Ashton lived in Leadville, and the Little Giant claimants in the adjoining county of Pitkin, between which and Lake county there was regular and frequent mail communication. No explanation is offered for the failure to inquire at the land office about it. If the property then possessed the apparent value now claimed for it, and the clients were repeatedly asking about it, some explanation ought to be given for the omission to ascertain whether the right to a deed had accrued. Assuming, however, that knowledge of the patent did not come to the Little Giant people for more than two years after it was transmitted, it becomes important to trace the history of this suit from the time it was begun, in 1884, until it was tried, in 1891, in Arapahoe county.
It has already been stated that the original hill was filed on the 5th of August, 1884. Summons was issued on the same day, and served on the 8th on Bracken and Daniel, and returned not found as to Moore, the other defendant. The defendants who were served filed a demurrer on the 15th of August, 1884. Nothing further was done in the case until *399 the July term, 1885, when Moore came in with a motion to dismiss for the failure to prosecute.
The cause stood on this demurrer and motion to dismiss until the 12th day of November, 1888, when a judgment of dismissal and for costs was entered in favor of the defendants. Leave, however, was reserved for the plaintiffs to move to reinstate. No proceedings were had under this leave until the 7th of January, 1889, when the plaintiffs presented their petition for reinstatement. It would appear that under that petition the cause was reinstated, since on the 15th of the same month the cause was again dismissed as to Moore, and by the same order reinstated. On the 21st following the cause was again dismissed as to Moore. Various proceedings were had in the cause at that term of the court, which resulted in the filing of an amended complaint on the 20th of February, to which Daniel and Bracken made answer in August of the same year. In March, 1890, by consent of the parties, the cause was transferred to Arapahoe county. In some way and for some reason which the record does not make plain, many other parties were brought into the suit who had become interested in the property by various transfers since August, 1884. Another summons was issued, and the issue tendered by the answering parties is the one on which the case was tried in 1891. This issue was formed by an answer filed on behalf of some of the defendants on the first of December, 1890. It will thus be seen that from the time of the dismissal of the suit No. 10, in July, 1882, nothing whatever was done with reference to the enforcement of the rights of the plaintiffs or their grantors, except to file a complaint and issue a process on the 5th of August, 1884. That suit remained dormant from the time it was started until August, 1889. At that time one of the defendants had not been served, and as to him the suit was dismissed. There was an attempt made-to bring that order of dismissal to this court bjr an appeal, and we refused to take jurisdiction of it, because it was not a final judgment which justified that proceeding. We do not now intend to dispose of that *400 question, preferring to rest the opinion on the other basis. It is only referred to, to show the steps which the plaintiffs took in the prosecution of their suit. The demurrer to the original complaint was filed on the 15th of August, never called up, determined or argued, or in any wise disposed of, and even now would seem to stand as an issue of law undetermined in the case. The parties probably waived the error when they filed the amended complaint in February, 1889, and the defendants are equally concluded by their action in responding by the answer, in August of the same year, and neither can be heard to complain of the court’s procedure. At all events, we regard these errors in the proceeding as totally unimportant, and without bearing on the fundamental error which pervades the litigation.
There are a few matters outside the litigation itself which ought to be noticed before we proceed to state the law which controls the decision. Disregarding the statements of the parties concerning their first knowledge of the existence of the patent, and their want of it from 1882 to 1884, it is shown by the plaintiffs that sometime in 1884, prior to the commencement of the suit, the owners of the Giant were advised of the fact that the patent was issued. Taking their case to be true in these particulars as they have established it, in the summer of 1884 they were fully advised that the government title had passed to Moore, Daniel and Bracken. At this time, Moore was living in Leadville, and Bracken in Aspen. Possibly, at this time, Daniel was living in Pitkin county. He was certainly there very shortly thereafter. The plaintiffs attempt to prove a demand on Moore for the deed, and the tender of one hundred dollars, which was a part of the consideration to be paid for the transfer under the contract of 1882, as they attempted to prove it. It also transpires that the deed was sent to Aspen. If not, some communication was had with some of the firm of Taylor, Ashton & Bell concerning it, and there is an attempt to show a demand on Bracken at about the same time. The parties refused to execute it. It is idle to state the grounds assigned by the *401 witnesses for the refusal, because it is enough for ,the purposes of this adjudication to state that the Bonnybel owners refused to execute the deed. They thus put the Little Giant people on notice, if they had any rights to the ground in controversy, they were bound to attempt to enforce them. They could not otherwise be obtained. Shortly after this time, the original complaint was filed, which the plaintiffs insist operated legally to protect their rights. As has been heretofore stated, nothing was done in that litigation, and the case stood on an issue of law tendered by a demurrer from that time until 1889. In 1887, which was some three years after the suit was started, work was prosecuted on the boundary line between the Giant and the Bonnybel for the purposes of what is known as the “ apex litigation ” between the Durant and Emma owners and the locators of property farther down the vein. Taylor and Ashton, who were owners in the Giant at the time of the compromise with the Bonnybel, were employed in that litigation, and one or both of the partners probably remained in the litigation for some years, and presumably they were advised of the proceedings therein. The work which was done was done by order of the court, and accessible to the various litigants. About this time, and in the late summer of 1887, after the discovery of ore in the disputed strip, the owners of the Bonnybel commenced to convey their property to other parties, and various conveyances were executed and leases given, until, in 1888, the title passed out of the original owners and into third parties. The lease was executed to Eames and others, and what will be called the “ Eames lease ” was from that time forward operated to the great profit of the holders. Work was done under that lease for many months, and large amounts of ore taken out; but the amended complaint was not filed until August, 1889, and the one upon which the trial was had until April, 1890. It might, under some circumstances, become important to determine whether what is known as the “ big stope,” out of which the principal value came, was or was not within the limits of the disputed territory. The *402 plaintiffs produced a map on the trial, exhibiting lines which, if properly drawn, included the stope and tended to show the liability of the defendants. We must presume that the attorneys took the lines on trust and accepted the map as prepared by their surveyor without question, because, in the progress of the examination, it was developed that the map did not show the lines according to the patent. The surveyor had undertaken to decide a legal question, and prepare a map in accordance with his theories of the law. If the parties and the attorneys had knowledge of this proceeding, it would properly subject them to very severe criticism, since, unexplained, it would appear to be an attempt to mislead the court.
Had the contract been proved as laid, and had a sufficient consideration been shown to uphold it, the complainants were not entitled to file a bill for its specific performance.
When the foundations of our system of equity jurisprudence were first laid by the learned lawyers and the wise judges who were its authors, it was declared that whenever a party invoked the extraordinary powers of a court of equity to compel the specific performance of a contract, he must proceed with both diligence and promptness. These qualities were to be measured by the character of the property involved in the litigation. The absence of this diligence has long since become crystallized in the legal term “laches,” which is incapable of an exact definition, and dependent upon neither the lapse of time nor the force of those statutes which, in actions at law, determine generally the plaintiff’s right. The defense of laches is in no sense dependent upon the statute of limitations. The lapse of time and the staleness of the claim are undoubtedly the governing considerations which control the application of the rule, but the parties are always held bound to proceed with reasonable diligence in the enforcement of their rights. The Great West Mining Co. v. Woodmas of Alston Mining Co., 14 Colo. 90; Badger v. Badger, 2 Wall. 87; Twin-Lick Oil Co. v. Marburg, 91 U. S. 587; Galliher v. Cadwell, 145 U. S. 368; Godden v. Kimmell, 99 U. S. 201; *403 Clegg v. Edmondson, 57 Eng. Chan. 786 (8 De G. M. & G.); Warren et al. v. Adams, 19 Colo. 515.
It would be idle at this late day to attempt to declare the doctrine of laches in happier or more exact phraseology than it is expressed in the eases which we have cited. The rule was very accurately and satisfactorily stated in the case cited from the 14 Colo., by one of the learned judges of our supreme court. The sole and only question is whether it is equitable and right to permit the party to enforce his claim against the defendant when he has allowed it to grow stale. That the rule ought to be applied to the present case, unless there be some limitation on the right and power of the court to use it, must be apparent. If we assume the agreement to be accurately stated by the plaintiffs’ witnesses, it appears that in 1882 the Little Giant people made a contract with the defendants or their grantors by which they acquired title to a piece of ground, the value of which was then unknown, but which was of possible if not of great prospective value. They suffer two years to elapse after the patent is issued before they start a suit to enforce it. At the time the suit is brought they are advised that the defendants dispute the claim and absolutely refuse to execute the deed to which they claim to be entitled. At this time, which is onty two years from the date of the original contract, the occurrences out of which it arose were presumably tolerably fresh to the minds of all parties concerned, and the subject-matter of the present suit was probably then very capable of easy enforcement or successful denial. The plaintiffs in that suit, how-* ever, do not proceed to establish their right, but permit the suit to lie dormant for a period of more than five years before they file a bill on which they are willing to stand and commence any proceedings to confirm a disputed title. In the meantime, at the expense, the hazard, the risk and the labor of the defendants and their grantors, the strip of ground has developed into one of those bonanzas which make the sudden fortunes of mining camps, and keep alive the hope which is essential to the continuous and intelligent prospecting *404 development of the mineral resources of our country. The complainants or their grantors permit the patent to be recorded, transfers of title to be made, work to be prosecuted, and take no steps to restrain the trespassers and assert their rights. In these respects they have most certainly failed to take their share of the risk and such a share of the hazard as entitles them to tender consideration by a court of equity. To permit the plaintiffs to maintain their bill would be most inequitable, and a clear violation of all the principles which these and kindred cases recognize.
There is but one remaining consideration essential to the settlement of this litigation. It has been urged in argument, and was made the basis of an objection at the time of the trial, that the parties were not at liberty to use those facts which show the laches in the absence of a plea. It is argued with much force and some ingenuity that the doctrine could not be invoked, because with reasonable promptness and within two years from the time of the issuance of the patent, and shortly after that fact was first learned by the parties in interest, the present suit was begun. The argument is that the commencement of a suit prevents the application of the doctrine, and no matter how long the suit is delayed or how negligently it may be prosecuted, the fact that it is pending relieves the plaintiff from its operation. It is not our notion of the doctrine, and never was ,• and although there may be some cases which are suggestive of such a principle, the most distinguished court in this country has clearly -settled the question. We follow it without hesitation, and with a very sincere conviction of its accuracy, its justness, and its necessity. In Sullivan v. Portland Kennebec R. R. Co., 94 U. S. 806, it was decided that no plea was essential to this defense. This case disposes of the contention. The same distinguished tribunal, in a later case, and one coming from the same county and the same -camp, Johnston v. Standard Mining Co., 148 U. S. 360, held: “ The mere institution of the suit does not of itself- relieve a person from the charge of laches, and that if he fail in the diligent prosecution of *405 the action, the consequences are the same as though no action had been begun.” The present controversy comes clearly and plainly within the lines of that adjudication-. For two years the plaintiffs waited before they commenced their suit. When it was begun, it was left to linger upon the docket of the court, standing upon a demurrer filed by two of the parties, and dismissed as to the other one, and revived by no proceedings which can be called a prosecution, diligent or otherwise,’of the suit thus started, until August, 1889, when the first amended bill was filed. Even the suit as thus amended was not carried forward with the diligence which characterizes people who imagine they have valuable rights at stake which are denied; but it was left to languish until April, 1890, when the bill on which the case was tried was first filed in the district court of Arapahoe county. Thus, it may be truthfully said that for eight mortal years the plaintiffs failed to prosecute their action. There was a most notable absence of that “ conscience, good faith and reasonable diligence,” which courts of equity always require.
If this doctrine were not so entirely applicable and satisfactory, we should still hold the plaintiffs not entitled to recover on the contract as they alleged it and as they proved it. The contract concerned real property. It called for the execution of conveyances by the respective owners, transferring their interest and title to portions of the area in conflict. The only, contract which the plaintiffs attempted to prove was one executed by attorneys for the owners of the Little Giant, and by an attorney for two of the owners of the Bonnybel. The proof in the record is insufficient to warrant the conclusion that the attorneys had specific authority to make the contract into which they entered. It is certainly true that, as to the attorney Moody, there was no evidence that he had any authority whatever, except what might proceed from his employment to represent the defendants in suit No. 10, then pending. The trial court did not err when he held that an attorney at law, as such, was in *406 competent to execute a contract which would sustain this bill.
Either conclusion will sustain the judgment of the court below which dismissed the bill, and it will accordingly be affirmed.

Affirmed.