Wilson, J.
This litigation grows out of transactions connected with, the purchase of the town site of the town of Goldfield in the Cripple Creek mining district. These transactions took place chiefly between the plaintiffs and defendant Bellows of the one part, and defendants Zang, Sigel, Sturm and Heath of the other part, and as these latter are of the defendants really the main parties in interest, we shall for convenience and brevity in *108 this opinion speak of them as “ the defendants. ” The facts material to a proper understanding of the history of the case, and to a determination of the issues involved, are substantially as follows, as we gather them from the admissions in the pleadings, testimony, and exhibits contained in a very voluminous record. It seems that defendant Bellows first conceived the idea that it might be profitable to secure the necessary ground and establish a town about the locality where Goldfield was afterwards located. Realizing that it was necessary to have considerable financial aid to make successful an enterprise of this character, he applied to the plaintiffs to assist him in securing the co-operation and support of parties who would furnish this assistance. Thereafter, but through whose efforts this was brought about does not clearly appear, the defendants named were interested, and on May 14, 1894, they entered into a written contract and agreement with the plaintiffs and Bellows. The purpose of this agreement, as expressed in it, was to purchase or otherwise obtain title to certain real estate thereinafter described, or so much thereof as might be thought advisible by the defendants, for the purpose of platting the same into a town, selling and disposing of lots, etc. The plaintiffs and Bellows agreed without other compensation than that thereinafter particularly stated, to give up and devote their time and efforts to the obtaining of title to the said lands by purchase or otherwise, under the direction of said defendants, or a majority of them. The defendants agreed to contribute in equal proportion such sums of money, not to exceed $12,000, as they, or a majority of them, the defendants, might deem necessary to obtain the lands and to improve the same. All options were to run to, and title to be taken in the name of, the defendants. When title to such lands as designated by defendants, was secured, they, these defendants, would have the right to plat and subdivide the same into lots, streets, alleys, etc., and to sell the same upon such terms and conditions and for such sums as they might see fit. When all moneys advanced by them should have been paid back to them from *109 the sales of lots, then the plaintiffs and Bellows were to receive a conveyance of an undivided three eighths of all lands remaining unsold, or three eighths of the proceeds of the same, of which amount Bellows was to receive three sixteenths, and each of the plaintiffs one sixteenth. The four defendants were also authorized, if they saw fit, to transfer all of said lands to a corporation to be organized under the laws of Colorado with a certain capital stock, and if this was done, the plaintiffs and Bellows should receive, after the defendants had been reimbursed for their expenditures, the same proportion of the remaining capital stock, except a certain amount to be reserved for treasury stock. Nothing very material seems to have been effected under this contract. No option appears to have been secured in the names of the defendants, unless it be probably a small one for which the sum of $50.00, advanced by defendants, was paid. Title to no lands was obtained. About June 10, following, the defendants became dissatisfied, and notified the plaintiffs and Bellows of their desire to draw out, and quit the enterprise. Various reasons were assigned, among others, that the German National Bank had failed, and that thereby moneys of Zang had been tied up, and also that what was known and designated as the Cripple Creek war or strike had broken out and was then raging, thereby rendering the prospects of a successful carrying out of the town enterprise improbable. In pursuance of this, on June 11, the following was indorsed in writing upon the contract of May 14, and subscribed by each of the parties thereto, to wit: “This contract is hereby declared null and void by the mutual consent of all the parties thereto. Witness our hands this 11th of June, 1894.” At this time the defendants agreed to assume all expenses and obligations incurred under the May contract, and agreeably thereto they paid to the plaintiffs and Bellows various sums of money, and remitted certain sums which they were owing to the defendants, amounting in the aggregate to more than $500. At this meeting, the prospect of going on with the enterprise seems to have been discussed between Bellows and the plain *110 tiffs, and Bellows stated to tliem that he thought he could get one H. A. McIntyre to go into the deal in the place of the retiring parties, and that he intended to make the effort. Thereupon plaintiffs requested him to give them a little time to see if they could find any one who was willing to furnish the financial backing, and it was agreed between them that they should have twenty-four hours to do this, if possible. They failed in this, and within a few days thereafter, Bellows closed a deal with one H. A. McIntyre as trustee, — the cestui que trust not being designated, — and a contract was drawn up between them substantially to the same effect as that of May 14, between the other parties, except that to this McIntyre as trustee and Bellows alone were parties. Some time thereafter, the precise time not being definitely fixed, but apparently between the middle and last of August, the defendants Zang, Sigel, Sturm and Heath with some other parties, claimed to have purchased and succeeded to the interest of McIntyre, the larger part of such interest passing to those defendants. In pursuance of this agreement, title to lands was secured and conveyed to defendant, the Portland Town and Mineral Company, a corporation organized for the purpose by defendants Bellows, Nagel, Frazer, Coffin, Campion and Charpiot, and of which defendants Zang, Sigel, Sturm and Heath were the largest stockholders. Under the ownership of tins corporation, defendant Zang being president, the town of Goldfield was laid out, and a large number of lots were sold. For the furtherance of the enterprise, the defendants Zang, Sigel, Sturm and Heath had up to the time of the institution of this suit, advanced or become responsible for about $70,000, and there had been received back from the sale of lots by the company about $21,000. On December 26, 1895, the plaintiffs filed their bill of complaint in this action, in which they alleged a fraudulent combination and conspiracy between defendants Bellows, Zang, Sigel, Sturm and Heath, to defraud them of their interest in the enterprise; that they had proceeded and were proceeding secretly to carry out for their own exclusive benefit the en *111 terprise contemplated by the contract of May 14; that without the knowledge or consent of the plaintiffs, they procured the incorporation of the defendant corporation by the defendants Nagel, Frazer, Coffin, Campion and Charpiot, but the real incorporators and parties in interest in said company were at all times the defendants Zang, Sigel, Sturm, Heath and Bellows, and that their object in having the company incorporated and directed by the other defendants was in furtherance of their wrongful scheme to mislead and defraud these plaintiffs. They demanded judgment for an accounting for all moneys and properties realized from sales and transfers of the town property; also for a decree declaring and establishing plaintiffs’ rights to have three sixteenths of all the capital stock and assets of the company, and of all property belonging to it, and that the said decree determine that the defendants hold all of said property, stock and assets in trust for the plaintiffs to the extent of said three-sixteenths interest. Defendants, the Portland Town and Mineral Company, Nagel, Frazer, Coffin, Campion and Charpiot joined in a verified answer, denying all of the allegations of the complaint. Defendants Zang, Sigel, Sturm and Heath joined in a separate answer, denying all of the material allegations of the complaint, and setting up as a second defense the cancellation agreement of the contract of May 14, executed on June 11. The separate answer of Bellows was substantially to the same effect. Plaintiffs replied, admitting the execution of the cancellation agreement, but alleging that it was procured from them wholly by'the fraud and by the false' and fraudulent representations of defendants Zang, Sigel, Sturm, Heath and Bellows; that it was without consideration, and that it was part and parcel of the conspiracy entered into by said defendants to wrong and defraud the' plaintiffs.
Upon trial the court of its own motion called a jury for advisory purposes, and submitted to them the following interrogatory, to wit: “Was the cancellation of the contract of May 14,1894, procured from the plaintiffs by fraud or decep *112 tion or false representations of the defendants or either of them?” This was answered by the jury in the affirmative. Thereupon some further testimony was introduced by both parties and the case being submitted to the court, a judgment was rendered dismissing the complaint and in favor of the defendants, on the ground that plaintiffs had been guilty of laches in bringing the action. Upon this action of the court, plaintiffs assign error.
The term “laches” in its broad legal sense, as interpreted by courts of equity, signifies such unreasonable delay in the assertion of and attempted securing of equitable rights as should constitute in equity and good conscience a bar to recovery. The doctrine is founded upon the universally conceded justice and paramount importance of the proposition that the repose of titles and the security of property are manifestly promoted by fully acting upon the maxim, Vigilantibus, non dormientibus, jura subveniunt. A learned judge has aptly and beautifully said that this power as exercised by courts of equity is well symbolized by the emblem of Time, “who is depicted as carrying a scythe and an hourglass, that while with one he cuts down the evidence which might protect innocence, with the other he metes out the period when innocence can no longer be assailed.” No specific limit of time can be fixed within which the doctrine may be successfully invoked in courts of equity. It is not essential that such time should have elapsed as to make the statute of limitations effective. Mere lapse of time of itself, unless sufficient to operate as a statutory bar, may not- always be adequate, but when coupled with such conditions and acts of the parties as to indicate assent, acquiescence or waiver, it may. The two propositions of bar by length of time and bar by acquiescence, are not distinct, but constitute one proposition only. Lapse of time may be evidence of acquiescence of more or less weight according to the circumstances of the case, but as distinguished from delay, acquiescence imports conduct. It is proper, also, when the doctrine is invoked, for the court to consider the character and nature of the property interests *113 involved. This may be and often is a most material consideration, and may be of sufficient weight to determine the question. “ A delay which might have been of no consequence in an ordinary case may be amply sufficient to bar the title to relief, when the property is of a speculative character or is subject to contingencies, or where the rights and liabilities of others have been in the mean time varied. If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to His advantage.” Kerr on Fraud and Mistake, 306.
To summarize, in the determination of the question as to whether or not the laches of a party asking relief should constitute a bar to his recovery, a court of equity may and should consider not only lapse of time, but the acts and conduct of the party, if any, indicating either his assent to, or acquiescence in the acts of the opposing party of which he then complains, or a waiver of his rights, and the nature and character of the property interests involved and to be affected. These propositions of law are elementary, and need from us no citation of authorities. They are announced by all of the text writers, and have been recognized by the repeated decisions of the highest judicial tribunals in England and in the United States, during a period covering more than 100 years, — in fact, from the birth of equity jurisprudence. We content ourselves with a reference to a few decisions of the highest courts of this state, and of the United States supreme court.
In Hagerman v. Bates, 5 Colo. App. 402, Judge Bissell, in the course of an able opinion, said: “ When the foundations of our system of equity jurisprudence were first laid by the learned lawyers and the wise judges who were its authors, it was declared that whenever a party invoked the extraordinary powers of a court of equity to compel the specific performance of a contract, he must proceed with both diligence and promptness. These qualities were to be measured by *114 the character of the property involved in the litigation. The absence of this diligence has long since become crystallized in the legal term “ laches,” which is incapable of an exact definition, and dependent upon neither the lapse of time nor the force of those statutes which, in actions at law, determine generally the plaintiff’s right.” It is true that the judgment of this court in this ease was reversed by the su-, preme court, but not upon the ground that there had been any error in the statement of the doctrine of laches. On the contrary, in so far as the supreme court referred to such statement, it expressly approved and indorsed it.
In Great West Min. Co. v. Woodmas of Alston Min. Co. et al., 14 Colo. 90, it was held that a delay of less than two years under the existing circumstances was sufficient to bar a recovery. In the opinion rendered by Justice Hayt, it was said: “ Prom the time the sheriff’s deeds were executed and delivered, in 1884, until this suit was commenced, in 1886, they permitted these defendants and their grantors to remain in the undisputed possession of the property without protest, permitting them to develop the same under the belief that they had acquired a good title thereto. * * * By the silence of plaintiffs they were lulled into purchasing and making expenditures upon this property that they otherwise might not have made, although it is true they ultimately made a profit as the result of the hazard incurred.
“Under these circumstances, we are to determine whether the court erred in dismissing the bill on account of the laches of the plaintiff. It is a familiar principle that courts of equity will only grant relief in cases in which the application therefor is made promptly and without unreasonable delay, whatever may be the merits of the controversy. The necessity for the application of this rule to cases in which the subject-matter of the litigation is the right to unpatented mining-property, the only value of which arises from the precious metals contained therein, is apparent. The value of such properties is always uncertain, and usually purely speculative. This case furnishes an illustration of the uncertainty of such values.”
*115 Justice Hayt cited approvingly numerous leading authorities in support of his position, and among others that of Pollard v. Clayton, 1 Kay & J. 480, in which relief was refused because plaintiff had delayed eleven months after suit might have been brought. The court refused even to allow an amendment setting up excuses for such delay, and said: “ Instead of that, the plaintiff waits eleven months, and then, at last, the bill is filed. I do not look out of the bill, as the case made has not done so; but it is enough for me to say that coal, like all other articles of constant use and constant sale, is a commodity fluctuating from day to day in its market price, and, during the interval which has elapsed, there may have been every possible variety of price, of rise or decline, and the parties are not now in the same position. * * * It is not equitable — and in this court, especially, it would be improper — -to give relief of that description after such a period of delay as in this case has been allowed to occur between the time when the plaintiff was first in a position to file a bill, and the time when he took upon himself to file it. Having regard to the circumstances of delay alone, the court ought not to give relief after laches of this description.”
In Oil Co. v. Marbury, 91 U. S. 592, Mr. Justice Miller, speaking of the necessity of more diligence being required in the assertion of rights where the property is of a speculative character, or may have 'a widely fluctuating value from natural causes, or from the exercise of the energy and courage of desperate enterprise, or from the expenditure of large sums of money, said, “ The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come and share the profit.
“ While a much longer time might be allowed to assert this right in regard to real estate whose value is fixed, on which no outlay has been made for improvement, and but little change in value, the class of property here considered, *116 subject to tlie most rapid, frequent and violent fluctuations in value of anything known as property, requires prompt action in all who hold an option whether they will share its risks or stand clear of them.”
The case of the Great West Mining Co. v. Woodmas of Alston Mining Co. was cited approvingly by the United States supreme court in Johnston v. Standard Mining Co., 148 U. S. 360. This was a case from Colorado involving an interest in mining property, and the court said, inter alia, “Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require not only clear proof of fraud, but prompt assertion of plaintiff’s rights.”
In Brown v. Wilson, 21 Colo. 314, the doctrine announced in the Great West — Woodmas case was reaffirmed, and the court said: “The laches that will bar a recovery in a particular case depend to a large extent upon the character and nature of the circumstances surrounding the transaction. Where the subject-matter of the litigation is unpatented mining property, purely speculative in value, the necessity for prompt assertion of title has always been recognized by the English and American courts.”
Applying these principles to the facts of the case at bar, we are clearly of opinion that the trial court did not err in its judgment of dismissal on the ground of laches of the plaintiffs.
On the very day of the cancellation of the agreement of May 14, defendant Bellows told the plaintiffs that he was negotiating with McIntyre, and that he thought he could interest him in the deal in place of the retiring parties. At their request he gave them twenty-four hours within which to find a party who would furnish the financial backing. Failing in this, Bellows closed the deal with McIntyre, and of this fact notified plaintiffs by letter to Weydemeyer of date June 15. The precise date at which the plaintiffs first *117 heard that the defendants were connected with and interested in the new scheme with Bellows is not fixed. All testify, however, that it was in August, 1894, and it must therefore have been about thé time or very soon after they went into it. Graff testifies that in August, 1894, he heard that defendants were doing something with the town site of Goldfield; that in September following, he knew who were the incorporators of the company, and that in October, 1894, he told defendant Zang that he thought they (defendants) should give them (plaintiffs) “something for consideration,” and when asked what he wanted, he replied, “ A half a dozen, or a dozen lots or so.”
Weydemeyer testified that he first learned of the incorporation of the town company, and that the defendants were again enlisted in the scheme in connection with McIntyre and Bellows about the middle of August, 1894.
Schaufelberger testified that in August, or September, 1894, he learned that the defendants were again interested in the town site scheme, being so informed by defendants Bellows and Heath, at the office of the company on the town site; that he thereupon said to them that there was a little something coming to him yet, and they told him to go and pick out a lot, the best he could find, which he did; that after-wards he bought another lot for $360, and paid $1.00 on the purchase price; that in the fall of 1894 he had a talk with defendants Zang and Sturm and requested them to “release the lot ” which he had bought, so that he could secure it as the other, — without payments.
It hence clearly appears that for at least fifteen months prior to the institution of this suit, the plaintiffs had full knowledge of defendants’ interest in the town site enterprise, and of their relation to it, and that for some weeks prior thereto, —from about the time when defendants’ connection with the new enterprise commenced, — they had sufficient information and notice to have at least put them upon inquiry if they desired to assert any rights or claims in themselves. During all of this time, they made no effort to legally assert or enforce *118 any claims to or interest in any part of the property or stock of the company or of the defendants. They never even orally made any such claim to defendants or either of them, or to any one else. On the contrary, their acts and conduct were such as to conclusively show that they fully acquiesced in and assented to the action of defendants and waived all claims, if they had any, for a share in their interest. All that they ever did ask was the gift of a few lots, and this was requested, as we can only conclude from the evidence, not as a legal right, but as a donation. They sat idly by for more than a year, permitting defendants to expend many thousands of dollars in the furtherance of a doubtful and precarious enterprise, and when by this expenditure, as well as by the courage and energy of defendants, it appeared to be firmly established and successful, they for the first time discovered that they had been defrauded, and declared that they were entitled to an interest in the property. Such a claim does not appeal with any force to a court of equity. Under such circumstances the laches of the parties should bar any recovery. To give them the relief asked would be against equity, good conscience, and fair dealing. The lapse of time alone, because of the character of the property involved, is a consideration of much force in determining the question as to the application of the doctrine of laches. If mining property is conceded to be of such a precarious nature and value, that unusual diligence is required in the assertion of adverse rights, to a large if not equal degree must be town site property within a wholly mining district, it being dependent for its values entirely upon the success and value of the adjacent mines. Whether or not the lapse of time alone was sufficient in this instance to sustain a plea of laches in bar of recovery, it is not necessary for us to determine, because of the concurring acts and conduct of plaintiffs showing acquiescence and waiver. The two together were undoubtedly sufficient.
There are other grounds properly before the court on assignments of cross-errors by defendants, upon which this judgment could and should be sustained, independent of the ques *119 tion of laches, but the latter being the one upon which tire trial court based its decision, and being lield sufficient, it is unnecessary to discuss them. We will say, however, that although the finding of the jury upon the special interrogatory submitted was not material in the view which the court took of the case, yet if this had been otherwise, the court in the exercise of a sound discretion should have totally disregarded it. There was no evidence to support it. It is of course axiomatic that fraud is rarely susceptible of direct and positive proof, but it is equally true that to sustain such an allegation the evidence must develop something more substantial and tangible than mere suspicion.
Upon plaintiffs’ own showing, they were not entitled to the relief demanded, and there being no material error prejudicial to plaintiffs disclosed by the record, the judgment will be affirmed.
Affirmed.