[No. 4652.]

## WOODRUFF v. WILLIAMS.

**1. Laches.**

Courts of equity will not interfere if a party slumbers on his rights or the means of detecting fraud. The laws assist those who are vigilant; not those who sleep over their rights.

**2. Laches—Fraud—Notice—Presumption.**

The presumption is that if a party affected by any fraudulent transaction or management might with ordinary care or attention have seasonably detected it he seasonably had actual knowledge of it. Full possession of the means of detecting fraud is the same as actual knowledge.

**3. Same—Notice.**

Whatever is notice enough to put an interested party upon inquiry is generally regarded as good notice of all those matters which an inquiry prosecuted with reasonable diligence would have disclosed.

4. **Fraud—Laches—Acquiescence.**

If one with sufficient notice or means of knowledge of his rights and of all of the material circumstances of the case lies by for a considerable time and knowingly and deliberately permits another to deal with property or incur expense under the belief that the transaction has been recognized, or freely and advisedly abstains for a considerable lapse of time from impeaching it there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity.

5. **Laches—Trusts and Trustees.**

Where the relationship of trustee and cestui que trust exists by an express trust and there is no assertion of adverse claim or ownership by the trustee, as a general rule lapse of time can constitute no bar to relief; but where the trust relation is repudiated or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief on the ground of lapse of time.

6. **Laches—Absence.**

Absence or residence remote from the scene of the transaction complained of cannot excuse laches.

7. **Wills—Trusts and Trustees—Laches.**

Where plaintiff, a residuary legatee, was twenty-two years old at the time of the death of the testator and knew that she was a legatee and knew the executor and the contents of the will and that defendant was executor thereof and that under the will the executor was directed to invest the legacy and to pay her the interest thereon semiannually for ten years and then to deliver the legacy to her, and knew also that at the settlement of the estate it was reported insolvent and nothing was paid to the legatees, and upon inquiry could have learned that the executor soon after the settlement of the estate became the owner of lands which had belonged to the estate, and for thirteen years after the settlement of the estate plaintiff made no inquiry as to the condition of the estate, during all of which time defendant was in possession of said lands, openly claiming and exercising ownership thereof and expended much money in improving the same, and during which time the value of said lands were largely enhanced partly through defendant's efforts and expenditure of money, plaintiff was guilty of such laches as will preclude any equitable relief in an action against said executor.

*Appeal from the District Court of Las Animas
County:*
*Hon. Jesse G. Northcutt, Judge.*

James M. Rice made his last will and testament,
wherein, after providing for the payment of his
funeral expenses and debts, he devised to each of his
six nephews and to his niece Mary the sum of $500.
The will then provides that, after deducting the above
named bequests, the balance of all his property shall
be divided into four equal shares, for the benefit of
his three sisters, Joanna E. Wallace, Sarah B. French
and Eleanor D. Rice, and to his niece Elizabeth L.
Rice, one share to each of the four named: "The
amounts of the said bequests to be severally invested
by the executors of my will, and the interest to be
paid to the said beneficiaries semiannually for ten
years from the time of my death. And then the
principal amounts to be severally paid over to them."

Provision is then made for the appointment of
Joanna E. Wallace, Thomas T. Woodruff of Quincy,
Illinois, and William B. Collins of Keokuk, Iowa, as
executors of the will.

James M. Rice died about the 5th day of Decem-
ber, 1879. Joanna E. Wallace and William B. Col-
lins declined to act as executors of the will in the state
of Colorado.

Woodruff then resided at Quincy, Illinois, where
also lived Mrs. Wallace with whom Eleanor D. Rice
(now Walker) and plaintiff Elizabeth L. Rice (now
Williams) resided.

Shortly after the death of Rice Mrs. Wallace had
defendant Woodruff call at her residence in Quincy
and informed him that he was named as one of the
executors of the will; that she and the other executor
did not care to accept the executorship; and that it
was desired that Mr. Woodruff come to Colorado and
administer the estate. This he did.

He came to Colorado, was duly appointed execu-
tor by the court, administered the estate, made his
final settlement, and was discharged in the month of
August, 1881.

At the close of the administration it was found
that the estate would pay but 52 cents upon the dollar
of the claims allowed against it, the remaining 48
per cent of such indebtedness and the specific lega-
cies still remaining unpaid.

Without attempting to describe the real estate
of the decedent, it may be classified as follows: En-
cumbered property, unencumbered property and cer-
tain property of which he was the owner of an
undivided one-half, the other half being owned by
Edward C. Smith, upon whose interest Rice held a
deed of trust to secure the payment of a promissory
note for $1,450.

Of the encumbered property one portion was
mortgaged to N. P. Hill. After the letters testa-
mentary were issued and previous to the closing of
the estate Hill foreclosed his deed of trust and the
property was purchased by one J. M. John as the
agent of Woodruff. The note secured by the other
deed of trust was held by John. He proceeded to
foreclose. Just previous to the date of sale Woodruff
purchased the note and John, at Woodruff's instance,
purchased the property at trustee's sale. It is not
quite clear whether John purchased this property in
his own right, and subsequently sold Woodruff a half
interest therein, or whether he purchased it as an
agent of Woodruff and subsequently purchased a half
interest therein. However, this is immaterial as we
view the case.

Mrs. Wallace, the sister of Rice, was one of the
heaviest creditors of the estate, and when it became
necessary to sell the unencumbered real estate at

administrator's sale she purchased it at Woodruff's suggestion.

The administrator's deed went to Mrs. Wallace, Mr. Woodruff supplying the money to make the purchase. She immediately executed a deed to the same property to T. D. Woodruff, brother of defendant, and T. D. Woodruff executed his bond for a deed wherein he agreed to reconvey this property upon payment of the advances made by defendant.

At the time of the death of Rice the interest upon the Smith note had not been paid for several years. Smith was dead, having died insolvent. The county court of Las Animas county, in which the estate of Rice was being administered, made an order authorizing the administrator to sell the Smith note for a sum not less than $1,450. T. D. Woodruff purchased this note with money advanced by defendant for the sum of $2,000. This deed of trust was defective, because no trustee was named. There was a second deed of trust held by the relatives of Smith. T. D. Woodruff purchased the second deed of trust, foreclosed it, purchased the property at the sale, and obtained a quitclaim deed from the Smith heirs.

In 1885 defendant purchased from Mrs. Wallace, for the sum of $5,000, all of the lands which she had purchased from the Rice estate and which had not theretofore been sold. She had, previous to this time, discharged her indebtedness to defendant on account of the money advanced for the purchase price of said land, Woodruff giving to her his notes for the $5,000, and securing their payment by an assignment of a life insurance policy.

Joel M. Rice, the father of James M. Rice, died in Iowa shortly before the latter died in Colorado.

Decedent also left estates in Iowa and Illinois. Mrs. Wallace was appointed as the administratrix of the estate of Joel M. Rice. Defendant Woodruff

and William B. Collins declined to act as executors of the estate of James M. Rice in Iowa and Illinois, and Mrs. Wallace was appointed sole executrix of the will in those two states.

The estate of Joel M. Rice obtained a judgment against the estate of James M. Rice for the sum of $12,000. The estates of James M. Rice in Iowa and Illinois proved insolvent.

Plaintiff Williams was served, personally and by mail, with certain processes issued from the courts in each of those estates, and in one instance filed her answer to a petition to sell real estate belonging to the estate of James M. Rice.

There is no evidence which shows that defendant at any time communicated to plaintiff Williams the condition of the estate in Colorado, although he says that he is under the impression that she was present at some of the conversations between Mrs. Wallace and himself. There is no evidence to show that he concealed or attempted to conceal any of his actions concerning the estate here from Mrs. Wallace or any of the other heirs or creditors.

This action was instituted by plaintiff Williams and her aunt Mrs. French upon the 4th day of December, 1894. Defendant demurred to the complaint; the demurrer was sustained; plaintiffs brought the matter to this court; the decision of the district court was reversed; and defendant was held to answer. A composition or settlement was made between plaintiff French and defendant, and the action was dismissed so far as Mrs. French was concerned.

The action then went back, to result in a judgment that plaintiff Williams was entitled to one-fourth of all the real estate described in the judgment, being the lands then owned by Thomas T. Woodruff which had at one time been the property of James M. Rice or the property of Smith embraced in the deed of

trust to Rice, and for the sum of $48,244.60, being one-fourth of the rents and profits collected by defendant from said property.

Defendant acquired title to all of the lands which had at one time been the property of decedent Rice, either by deeds direct from Mr. John, T. Dewey Woodruff or from Mrs. Wallace, less such portions as had been sold at administrator's sale, or by the parties above named to other individuals. So that in 1885 Woodruff had the record title to all of such property, with the exceptions above noted.

Much of this property was situate in or near the town of La Junta, which, at the time of the close of the administration, was a hamlet struggling for existence. Subsequently a railroad built some shops and hospitals there and made it the end of the division, causing it to be a somewhat prosperous railroad town. It also became the county seat of Otero county.

During the period between the time when Woodruff obtained the deeds to this property and the commencement of this action, for the purpose of increasing the value of the La Junta property he donated to the town of La Junta about $18,000 for a public library and about $2,000 to the public schools. He also constructed a public drinking fountain upon a portion of the property, and devoted some money toward the creation of a park in front of part of this property. At Trinidad he expended $5,467 for a public library, founded a kindergarten and devoted some money to railroad surveys. All of which was done for the purpose of promoting the welfare of the towns and incidentally increasing the value of this property. The money so expended amounted to upwards of $28,000.

In the accounting which was had in this case no allowance was made to defendant for any of these expenditures.

In addition to this outlay of money the defendant improved the property by extensive buildings, one of which cost upwards of $16,000, and others less amounts.

The defendant devoted practically all of his time from 1882 until 1902 to the promotion, welfare and development of the communities in which this property was situate.

At the time of the death of Mr. Rice plaintiff Williams was twenty-two years of age. She was residing with her aunt Mrs. Wallace and continued to reside there until her marriage to Mr. Williams in February, 1882.

Soon after the death of Mr. Rice Mrs. Williams learned that he had left an estate. About a month after his death she learned that she was one of the devisees and that Thomas T. Woodruff was named as one of the executors. She knew that Woodruff had gone to Colorado to settle the estate. She never wrote to the clerk or the judge of any court at Trinidad concerning the administration of the estate. She never visited either Las Animas, Bent or Otero counties to investigate her interests in the estate. She never made any inquiry of defendant Woodruff as to the administration of the estate, did not write him concerning same, and did not send any one to him to make such inquiries. She was entirely under Mrs. Wallace's care and protection from December 1, 1878, until her marriage. Her relations with Mrs. Wallace then and since her marriage have been friendly. She never made any inquiry of Mrs. Wallace or either of her other aunts. She says that she first learned of the alleged misconduct of defendant concerning her interest in the estate in 1891, when the law firm of Mahin & Johnson reported the same to her. She first consulted with her husband about investigating the affairs of her uncle's estate and

protecting her interests in September, 1891, after the visit of Mahin & Johnson. She frequently saw defendant Woodruff at her aunt's home, both before and after he took charge of the estate. She never conversed with him upon the subject of the estate, or any business matters. She talked with Mrs. Walker concerning the administration of the estate. She knew that her aunt Mrs. Billings, who was a creditor of the estate, received but 52 cents on the dollar of the amount of her claims, and that the rest of the creditors received the same amount. She knew that her aunt Mrs. Wallace was a creditor of the estate, and thought that the amount of the claim was $5,000. She knew that Mrs. Wallace and Woodruff were in constant communication by letter. She states in her testimony that she did not know that the estate of James M. Rice was being administered in the county court of the county of Adams, state of Illinois, and in the circuit court of the county of Lee, state of Iowa; yet the transcript of record of the administration of the estate in Adams county, Illinois, wherein Mrs. Wallace was executrix, shows that this plaintiff and her husband entered their appearance in answer to a certain petition and consented that an order be made for the sale of certain property; and also that in the administration of the estate of Joel M. Rice, father of James M. Rice, which occurred in the county of Lee, state of Iowa, in a certain proceeding wherein Mrs. Williams was made defendant, it appeared that she was duly served with a process in an action to collect $12,000 against the estate of James M. Rice.

Mr. CHARLES E. GAST, for appellant.

Mr. J. N. CARTER, Mr. A. C. McCHESNEY and Messrs GOVERT, PAPE & GOVERT, for appellee.

Mr. JUSTICE BAILEY delivered the opinion of the court.

In the complaint as originally filed, and upon which the demurrer was based, it was alleged that the administration of the estate of James M. Rice in Colorado was closed in 1891, instead of 1881. The demurrer interposed was that the action was barred by reason of the statute of limitations. Upon the allegations of the complaint the court found that the action was not barred. (See *French v. Woodruff,* 25 Colo. 339, wherein will also be found a complete statement of the allegations of the complaint.) The question of laches was raised in the argument upon that demurrer and, while the court determined that that question must be raised by answer, in the opinion it is stated that from the case as made by the complaint it did not appear that the plaintiff was guilty of laches. However, as we shall presently discover, it appears from the evidence produced at the trial that plaintiff has slept upon her rights to such an extent as will bar a recovery.

Courts of equity will not interfere if a party slumbers on his rights or the means of detecting a fraud.—*Pipe v. Smith,* 5 Colo. 146; Angell on Limitations, § 190; *Young v. Cook,* 30 Miss. 330; *Johnson v. Johnson,* 5 Ala. 103; *Veazie v. Williams,* 3 Story 612; *McLure v. Ashby,* 7 Rich. Equity 440.

The laws assist those who are vigilant; not those who sleep over their rights.

To avoid the force and show the inapplicability of the doctrine of laches to the case at bar the plaintiff relies upon *Piatt v. Longworth,* 27 Ohio State 159; *Riddle v. Roll,* 24 Ohio State 572; *McCormick v. Ocean City Ass'n,* 18 Atlantic 112; *Lewis v. Welch,* 47 Minn. 193; *Nobles v. Hogg,* 36 S. C. 322, and *Warren v. Adams,* 19 Colo. 515. In her brief she

says that it has already been determined by this court in this action that plaintiff was not guilty of laches.— *French v. Woodruff,* 25 Colo. 339.

It will be remembered that when the case was here before it was upon demurrer, and this court held that laches was not a ground of demurrer; that when the point is raised by defendant, the usual and proper method is by answer, but because it was urged by both parties the court expressed an opinion concerning the laches of the plaintiff as shown by the complaint, the language of the court being as follows: "Though a cause of action be not barred by some statute, a court of equity may refuse to entertain a stale claim, or give relief, where the plaintiff once had a meritorious demand, if he has unreasonably slept upon his rights. Whether laches will be imputed depends largely upon the facts and circumstances of each case. Where the rights of innocent purchasers are involved or the subject-matter of the controversy is materially changed, and in various other circumstances not necessary to specify, a strict rule may be enforced; but where, as in the case at bar, the defendant still retains in his own name title to a large part of the trust property he is charged with having bought, and the delay, in part, at least, is due to concealment of the wrongful acts by the defendant, and full relief, so far as the plaintiffs are entitled to anything, may be administered without injury to innocent third parties, a more liberal rule should be applied. Under the facts of this case, *as alleged in the complaint,* we think the plaintiffs are entitled to maintain their action."

As will be shown hereafter, the facts as they developed on the trial, so far as any concealment by the trustee, and so far as a necessity for diligence upon the part of the *cestui que trust* is concerned,

are materially different from those alleged in the complaint.

The plaintiff claims in her brief that she could have done nothing at an earlier period toward the recovery of the property in the hands of Woodruff because, by the very terms of the trust, he was to hold it during the period of ten years; that the question of the alleged laches of the plaintiff is one that concerns only plaintiff and defendant, the rights of no third parties having intervened; that in as much as this is an express trust, laches is not imputable to the *cestui que trust;* and that the failure of Woodruff to inform plaintiff of the condition of the estate, or that he had directly purchased the property, amounted to a concealment of the alleged fraud.

After reviewing such of the cases cited by the appellee as we have access to, we shall then consider these contentions as to why the doctrine of laches should not be implied against her.

The case of *Piatt et al. v. Longworth's Devisees,* 27 Ohio State 159, is one in which the alleged wrongful actions of the administrator were similar to those charged against the defendant in this case. In that action, at the administrator's sale certain property was purchased in the name of certain of the relatives of the administrator with money furnished by the administrator, and subsequently the property was conveyed by the purchaser to the administrator. It was determined by a divided court that the heirs could maintain an action for the recovery of this real estate after a period of time from the purchase of the property, exceeding that which has elapsed in the case at bar; and at first glance it seems to be an authority for the maintaining of this action.

The action was commenced on the 11th day of March, 1850. The real estate had been sold by the administrator and was reconveyed to him on the 17th

day of December, 1834, but final settlement of the
estate was not made until 1846; so that the case dif-
fers from the one at bar in this, that the defendant
was still the administrator at the time when the real
estate was reconveyed to him, and the action was
commenced about four years after the settlement of
the estate.

Here the action was commenced thirteen years
after the settlement of the estate, and the property
was not conveyed to the defendant until after the
estate was settled.

In the Piatt case it is alleged in the bill that the
heirs had no knowledge of the fraudulent transac-
tions until within eight months before filing the same.
As we have seen, the estate was not settled and the
administrator discharged until four years previous
to the commencement of the action. The decision
of the supreme court of Ohio seems to be based upon
the theory that the administrator was a trustee of an
express trust, and that the holding of the property
purchased by him will not be deemed adverse while
the fiduciary relations continue, unless distinctly
disavowed.

Here, as we view the matter, defendant's dis-
avowal of the trust commenced with the settlement
of the estate in 1881, and this was brought to the
knowledge of the plaintiff by the failure of the trus-
tee to pay the semiannual interest as provided in the
will.

In the Ohio case it does not appear that there
was anything which should have called the attention
of the heirs to the violation of the trust by the admin-
istrator. There was nothing to put them upon their
inquiry. At least, in the opinion there is nothing
to show that that point was considered by the court;
neither does it appear to be argued in the brief of
the administrator, which is published with the opin-

ion. So the Ohio case is not in point, because the action was brought within four years from the time of the settlement of the estate, and the heirs had no information which would put them upon their inquiry until such time.

The case of *Riddle and Parker v. Roll,* 24 Ohio State 572, relied upon by plaintiff, is not in point, for the reason that in that case the doctrine of laches was not considered. One of the heirs was a minor at the time of the commencement of the action and time would not run against him until he attained his majority. It was determined in that case that the saving of the rights of the minor necessarily saved the rights of the balance of the heirs.

*McCormick v. Ocean City Ass'n,* 18 Atlantic 112, also cited by the plaintiff, does not appear to be material, for the reason that the question of the laches or indifference of claimants was not raised or passed upon. The staleness of the claim is not mentioned. The case deals entirely with the question of a purchase by a trustee inuring to the benefit of the *cestui que trust.*

*Lewis v. Welch,* 47 Minn. 193, is also relied upon by the plaintiff upon the question of laches. In that case the court spoke as follows: "It is, however, argued that the right of the plaintiffs to have the purchase by the defendant adjudged to be in trust is barred by the lapse of time. Upon the facts as established by the findings of the court, its conclusion upon this point should be sustained. It will be borne in mind that the title still remains in the defendant. Rights of innocent purchasers have not intervened. The land has remained *vacant and unoccupied.* In order that a right of action be barred by laches there should be knowledge or notice which should prompt to inquiry concerning the facts upon which a right of action rests, or there should be

some neglect of duty or of self-interest, to which want of knowledge may be attributable.''

It is also said: "The plaintiffs have not resided in this state since 1865, and they had no actual notice or knowledge of any of the proceedings for administration or for the foreclosure, nor of any of the defendant's acts until six months prior to the commencement of this action.''

From this statement it will be seen that the case is not in point. There, according to the findings of the court, the plaintiffs had no knowledge of the administration proceedings nor of the foreclosure proceedings, nor of any of the actions of the defendant. There was nothing to put them on their notice, nothing to put them upon inquiry. There also the property remained in the same condition, at the time of the commencement of the action, that it was at the time of the purchase made by the administrator.

Here, as we have seen, the defendant has expended a fortune in the improvement of the property and in the development of the resources of the country round about, in building schools and establishing public libraries. He devoted the better part of a strenuous life to the enhancement of the value of this property, while the plaintiff, with sufficient information to put her upon her inquiry and her notice, and knowing that she was not receiving the interest which the will of her uncle provided that she should receive, rests content until the property is made valuable, and then institutes an action to receive the benefits of the labors of another, which would not have been expended in this behalf but because of her inertia.

*Nobles v. Hogg,* 36 S. C. 322, cited by plaintiff, is not in point. In that case the defendant held in his hands as trustee certain moneys belonging to plaintiff, upon which he should have paid interest annually. He failed to do this for more than twenty

years. He acknowledged that he had received the money for her use and benefit. He acknowledged that he had not paid it nor the interest. He did not claim to hold the money adversely to the *cestui que trust*. The court said: "In this case the trustee admits he has not paid the interest, but nowhere introduces proof as to any adverse holding. It does not appear that his *cestui que trust* was ever informed that he held the moneys collected by him in 1854."

The admission of the defendant was that he never paid the claim "in any way, shape or form." We fail to see how the last statement of facts and the opinion given therein can be applicable to the facts here. In that case the trust was not repudiated, the defendant satisfying himself by saying, in effect: "It is true that I never paid anything and I owe the money, but I should not pay it because it has been in my hands for more than twenty years."

Plaintiff also cites the case of *Warren v. Adams,* 19 Colo. 515. There the inaction was excused because the claimant was afflicted with a phase of insanity, known as *amnesia,* or loss of memory. Consequently, the doctrine of laches did not apply. No excuse of that sort having been made in this case, *Warren v. Adams* has no application here.

The presumption is that if a party affected by any fraudulent transaction or management might with ordinary care or attention have seasonably detected it, he seasonably had actual knowledge of it.

Full possession of the means of detecting fraud is the same as actual knowledge.—*Pipe v. Smith,* 5 Colo. 146; *Farnham v. Brooks,* 9 Pick. 212; Angell on Limitations, § 187.

"The statute of limitations therefore shuts the doors of the courts against a party unless he brings his suit within the prescribed time, although his claim

is still due and good faith would require its payment. And when he would take advantage of the exception which gives him a further time in case the cause of action has been fraudulently concealed from him, yet if he had the means of discovering the fact his want of knowledge is to be attributed to his own want of vigilance, and not to concealment by others."—*Nudd v. Hamblin,* 8 Allen 130.

Whatever is notice enough to put an interested party upon inquiry is generally regarded as good notice of all those matters which an inquiry prosecuted with reasonable diligence would have disclosed.—*Allen v. Moore,* 30 Colo. 307; *Yates v. Hurd,* 8 Colo. 343; *Filmore v. Reithman,* 6 Colo. 120.

"It is the well established principle that whatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."—*Kennedy v. Green,* 3 Myl. & K. 719; *Carr v. Hilton,* 1 Curtis 390.

"It will not do to remain willfully ignorant of a thing readily ascertainable."—*McQuiddy v. Ware,* 20 Wall. 14.

Judged by these rules, Mrs. Williams had or might have had full knowledge of the transaction at any time during thirteen years previous to the commencement of her action. She had knowledge that the final settlement of the estate was made in 1881, and that it was found to be insolvent. She knew that her aunt received but 52 cents on the dollar of the amount of her claim against the estate. She had knowledge that her aunt Mrs. Wallace was in constant communication with the defendant. Defendant frequently visited at the home of Mrs. Wallace, which was the abiding place of the plaintiff until

her marriage. She knew that she was one of the legatees under the will, and that she was entitled to interest upon her legacy each six months. She knew that she received no interest during any of the period for the thirteen years. She might with little effort, by writing to the judge or the clerk of the county court or by inquiring of her aunt Mrs. Wallace, have discovered that a large portion of this estate had been purchased by Mrs. Wallace and another large portion by T. Dewey Woodruff. She might, by making inquiry at the office of the clerk and recorder, have discovered that this property was all subsequently conveyed to the defendant.

All the means of discovering the fraud, if fraud there was, which we do not determine, which she possessed in 1894 were at her hand at all times after the settlement of the estate in 1881. For thirteen years she supinely waited until this property became valuable and her attention was called to the fact by lawyers who were desirous of taking the case, and then, after about three years, she instituted these proceedings.

It will be observed that during the long period over which the transaction referred to extended the plaintiff never made or caused to be made the slightest inquiry in relation to any of them. It could not have been difficult to ascertain that this property concerning which it is said the defendant was a trustee had been acquired by the trustee in his own name. If he held it in trust for the plaintiff, as alleged, ordinary diligence could not have failed to find the clew which in every case would lead to evidence not to be resisted.

With the strongest motives for action, the plaintiff was supine. If the transaction was fraudulent, as she alleges, she did nothing to unearth it. It was her duty to make the effort. She had the right to

know that the estate had at one time been possessed of this real estate. She never made the slightest inquiry, either in person or by letter, or caused any inquiry to be made as to what had become of this property. Knowing that she was a residuary legatee, and knowing that the claim was made that there was no residue, she had notice enough to excite her attention, and, having notice sufficient to put her on her guard and call for inquiry, she had notice of everything to which such inquiry might have led.—*Canty v. Green*, 3 Myl. & K. 732; Angell on Limitations, § 187; *Norris v. Haggin*, 12 Sawyer 53.

It is not disputed that the inventories, appraisement bills, petitions for sale and reports of sale gave full information as to the existence of this property; that it was sold by the executor; and that the records of Las Animas, Bent and Otero counties show that portions of it eventually passed into the hands of this defendant. If it is contended that the records are only a constructive notice to subsequent purchasers and encumbrancers, and are not such to other parties, for the purpose of this case, this may be taken as true, but this controversy hinges not upon the question of constructive notice. It is a question of the diligence of the party, whether she has exercised due diligence in ascertaining or endeavoring to ascertain her rights and pursuing her remedy. In this state, as well as in all others, the statutes provide for the recording of instruments of conveyance. A storehouse of information is here provided by law, open to every person. These laws, like all others, are presumed to be known to all who are affected by them, and as a matter of fact they are known to all citizens having the slightest degree of intelligence.

At the time of the commencement of these transactions this woman was twenty-two years of age, possessed of good education, and she apparently

moved with intelligent people. Her aunt with whom she lived was in constant correspondence with at least two lawyers; so it cannot be said that she was ignorant of the means by which she could have determined or ascertained the facts which are relied upon as showing a violation of his trust.

Being possessed of the means, it was her duty to prosecute inquiry with reasonable diligence unless she was lulled to sleep by some active deception, misrepresentation or fraud of this defendant or his emissaries. No claim of that kind is made. Although the plaintiff and defendant frequently met, she was silent concerning her alleged rights and he was silent concerning them. In cases of this character, failure to give notice does not constitute fraud. There must be a suppression of the facts from which knowledge may be obtained or a deception as to the actual conditions or a misrepresentation of the facts, none of which appear to have existed here.

It is not claimed that the notices necessary to be given by the executor of his intention to sell real estate or of his intention to make final settlement of the estate were fraudulently suppressed, or that they were not published according to law. The plaintiff excuses herself because she resided in Illinois and, while the papers published in Trinidad were sometimes sent to her aunt's house, she never read them.

In the case of Broderick's will, it is said that if this excuse could prevail it would unsettle all proceedings in rem and confusion would be the result. There is no pretense that the facts constituting the alleged fraud were shrouded in concealment. The plaintiff rests her case upon the allegation that she had no knowledge or information regarding the making and executing of any of the several deeds referred to in her petition by which the title to this property became vested in defendant until Septem-

ber, 1891, but as we understand the complaint and the record there is nothing to show that by any act of the defendant this knowledge was kept from the plaintiff, nor that the plaintiff could not have become fully advised as to all of the facts.

In the case of *Manning v. San Jacinto Tin Co.,* 7 Sawyer 430, the allegations of the bill were: "That your orator never heard of the various actings and doings hereinbefore * * * set forth, or any of them, until within two years last past."

This is held not sufficient, because no reason is given for not discovering the fraud, the court saying that there should certainly be some showing on this point, in view of the public and notorious acts alleged.

In the case at bar, the allegation of the bill is: "Your orators further represent and charge that your orators, Sarah B. French and Elizabeth L. Williams, had no knowledge or information regarding the making and executing of any of said deeds * * * and had no knowledge or information that the title to the lands owned by the said James M. Rice, deceased, at the time of his death, or in which he had any interest, and hereinbefore described, had been by means of said deeds or otherwise attempted to be transferred or transferred from the estate of said James M. Rice, deceased, to any in the said Thomas T. Woodruff, and had no knowledge or information that the said Thomas T. Woodruff claimed title to the lands hereinbefore last described adverse to the estate of the said James M. Rice, deceased, or adverse to your orators and the other heirs and devisees of the said James M. Rice, deceased, until after the first day of September, 1891."

It will be observed that here, as in the case last cited, no reason is given for not discovering the fraud. The proof in this particular does not aid

the bill, the plaintiff contenting herself by saying that she knew nothing of the facts and that she made no inquiry for the purpose of ascertaining them, relying upon the proposition that it was respondent's duty to inform her that he was endeavoring to defraud her and the other heirs.

Appellee contends that the case of *Swift v. Smith*, 79 Fed. 709, is not in point, for the reason that the land there in question had increased in value from $250 at the time of the void administrator's sale to $25,000 at the time the suit was brought, and had passed through many different hands, and had been improved. In that case the learned judge did not base his decision upon the ground that the property had passed into the hands of innocent third parties, because, he says: "Conceding but not deciding that the records of the deeds to and from Nye, the administrator, were notice to all parties claiming under him, that he originally held title in trust for the appellant, and that the decree of sale of the probate court was void, the appellant presents no case here which entitles her to relief in equity against a purchaser who paid $25,000 for the title to this land more than twenty years after these deeds were recorded, on the faith of the conveyances of the administrator and the appellant's silent abandonment of the property."

The court clearly intimates that the decision was based solely upon acquiescence and laches of the plaintiff.

"Counsel for the appellant invoke the principle that there can be no acquiescence and no laches where there is no knowledge, and contend that, since the appellant did not know that she had any interest in these lots until 1891, she cannot be charged with laches in asserting her rights."

In the case at bar, as we understand the position of appellee, it is that she could not be charged with acquiescence or laches because she did not know that this property had been purchased by the executor. The learned judge then proceeds to say: ''Ignorance which is the effect of inexcusable negligence is no excuse for laches, and knowledge of facts and circumstances which would put a person of ordinary prudence and diligence on inquiry is in the eyes of the law equivalent to a knowledge of all the facts which a reasonably diligent inquiry would disclose. Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient knowledge to lead him to a fact, he shall be deemed conversant with it * * * . This principle measures the knowledge which the law imputes to those who are charged with laches.''

After citing numerous authorities to the above proposition, the court then adverts to the facts as follows: ''When the appellant became of age, in 1871, she had met and was acquainted with John A. Nye, who had been the administrator of her father's estate.'' (In the case at bar, appellee was twenty-two years of age at the time of her uncle's death, and was then personally acquainted with the executor.) ''She had lived for ten years (from the age of four to the age of fourteen years) in the same town and for four years in the same house with her grandfather, who had been her guardian and had received $1,000 from this administrator for her benefit.'' (Here, the appellee resided with her aunt, who was in constant communication with the executor. She knew of the death of her uncle, of the appointment of the executor, of the existence of the will, and that she was a legatee.) ''She knew that

her father had lived and died in Pueblo county, in the state of Colorado; that he owned some property in that state; and that Nye had been the administrator of his estate. If these facts were not sufficient to excite attention and call for inquiry as to the property of this estate left unsold or improperly sold by the administrator, we are at a loss to know what facts would have been sufficient. The least investigation in the natural and usual place to make such an inquiry would have led unerringly to a discovery in 1871 of all the facts which the husband of appellant learned of his own accord, and brought to her attention in 1891, without any inquiry on her part."

So here, if the facts of which the appellee was cognizant were not sufficient to put her upon her inquiry, it is difficult to determine what facts would be sufficient. The least investigation in the natural and usual place to make such an inquiry would have led unerringly to a discovery at the time of the filing of the deeds to Woodruff of all the facts which plaintiff says counsel advised her in 1891.

The court then proceeds: "She was not the victim of any actual fraud or of any concealment. All the facts upon which she now relies were spread upon the records of the probate court of Pueblo county and upon the records of the register of deeds at Denver in 1871, open and ready for her inspection. The natural place to inquire for property of the estate of Russell, when she knew that he had lived and died in Pueblo county, in the state of Colorado, was in the probate court of that county. An inquiry would have disclosed a sufficient description of these lots and their location, both in the inventory of her father's estate and in the account of the administrator, to have led to a discovery of their occupation by Brown and of the record of the deeds

of them in the register's office at Denver. Under the principle of law to which we have referred the appellant must be charged with knowledge of all the facts on which this suit is founded, because she knew facts sufficient to put a person of ordinary prudence and sagacity upon inquiry which would have led inevitably to a knowledge of those facts, if it had been pursued with reasonable diligence.''

In principle we can see but little difference between the case of *Swift v. Smith* and this one. While it is true that in that case the property had changed hands and was no longer in the possession of the executor, and in this case it is in the possession of the executor, yet in that case it is conceded that the owners of the property took it with notice of the defects of the title. The case is determined squarely upon the facts which should have put the plaintiff therein upon her inquiry, and which are similar to the facts here. There the property was originally worth $250. It grew to be worth $25,000. Here, the property was originally worth but a few thousand dollars, and it grew to be worth many times that amount, the cash judgment alone being $48,000.

There, the property had been improved. Here, the property has been improved, and here, in addition to the improvements, the appellant has expended $28,000 for the enhancement of the value of this property.

If one with sufficient notice or means of knowledge of his rights and of all of the material circumstances of the case lies by for a considerable time and knowingly and deliberately permits another to deal with property or incur expense under the belief that the transaction has been recognized or freely and advisedly abstains for a considerable lapse of time from impeaching it there is acquiescence, and the transaction, although originally impeachable, be-

comes unimpeachable in equity.—2 Herman on Estoppel and Res Judicata, § 1063.

It is a familiar principle that courts of equity will only grant relief in cases in which the application therefor is made promptly and without unreasonable delay, whatever may be the merits of the controversy.

Laches and neglect ought forever to be discouraged. There is in chancery always a limitation. Nothing will bring a court of equity into action but pure equity and a reasonable diligence. The strongest equity may be forfeited by laches or abandoned by acquiescence. Nothing can call forth an equity court into activity but conscience, good faith and reasonable diligence. Where these are lacking the court is passive, and does nothing. Laches and neglect are always discountenanced.—*Great Western Min. Co. v. Woodmas of Alston Min. Co. et al.*, 14 Colo. 91; *Peebles v. Reading*, 8 Serg. & R. 493; *Sullivan v. R. R. Co.*, 94 U. S. 811; *Smith v. Clay*, 2 Amb. 645.

It is true, as a general rule, that when in case of an express trust the relation of trustee and *cestui que trust* is admitted to exist, and there is no assertion of adverse claim or ownership by the trustee, lapse of time can constitute no bar to relief, but where the trust relation is repudiated or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance in all such cases a court of equity will refuse relief on the ground of lapse of time.

The fraud must be one that is secret and concealed, and not one that is patent and known. The presumption is that if a party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.—*De Mares v. Gilpin*, 15 Colo. 76.

Measured by this rule, the plaintiff was at fault. Having failed to receive her installment of interest each six months for thirteen years, she had notice that the defendant had repudiated the trust, if any existed, and it was then her duty to make such investigation as would advise her of the full situation. Having had notice enough to excite her attention, she had notice of everything to which it is subsequently found that such inquiry might have led, and this inquiry, if any had been made, would have led to the information that this property, which had at one time belonged to the estate, was now held by the defendant, claimed by him as his own property, and dealt with by him as such. But it is said that it was the duty of the defendant to inform the plaintiff that there was nothing for her, and that, having failed to inform her how he was dealing with the property, he is guilty of having concealed it from her. This is not the law as we understand it. It was her business to inquire as to what had become of this property. Slight inquiry would have informed her as to the full situation.

"Concealment by silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry."—*De Mares v. Gilpin,* 15 Colo. 76; *Wood v. Carpenter,* 101 U. S. 143.

There is no proof of anything of that sort here. The order of the county court to sell the Smith-Rice note was made in April, 1881, and the entry showing the sale of the note was made in June, 1881. This was a matter of record.

On July 20, 1881, the deeds from defendant to Mrs. Wallace and from Mrs. Wallace to T. Dewey Woodruff of the Bent county lands were recorded. On July 26, 1881, the deeds between the same parties as to the Las Animas county lands were recorded. On September 23, 1881, the deed from John to de-

fendant for the Trinidad lots was recorded. On September 30, 1881, the deed from John to T. Dewey Woodruff covering the lands sold by Collins, trustee, was recorded. On the same date the power of attorney from T. Dewey Woodruff to T. T. Woodruff was recorded. On March 30, 1882, petition to sell real estate in Adams county, Illinois, was instituted and plaintiff Williams appeared and filed her answer. In October, 1883, the deed from T. Dewey Woodruff and Mrs. Wallace to T. T. Woodruff of the Las Animas county lands was recorded. · In March, 1885, the deed from T. Dewey Woodruff to defendant for the Las Animas county lands was recorded. In March, 1885, deeds were recorded in Las Animas and Bent counties showing transfers from T. Dewey Woodruff to Mrs. Wallace and from her to defendant. In December, 1885, defendant deeded to F. T. Moore an undivided half interest in certain lands. In 1887 defendant sold certain lots to The La Junta Town Company. In 1890 he made a declaration of trust of the Highland addition to the people of La Junta.

So it appears that there was no effort upon the part of defendant to conceal any of these proceedings. The deeds were promptly recorded and notice thereby promptly given to all the world that he was treating this property as his own.

There was an absolute lack of any reasonable diligence or any diligence whatever on the part of plaintiff to discover these transactions. She could have discovered all these matters by simply writing to the court at Trinidad and to the recorders of the several counties. Having had the means, she must be presumed to have had the knowledge itself.

"Reasonable diligence is always necessary to incite the activity of a court of equity. The strongest

equity may be forfeited by laches or abandoned by acquiescence."—2 Colo. App. 140.

It is said in *Warren v. Adams,* 19 Colo., at page 526: "An essential element in a case to constitute laches is that the party whose delay is in question shall have been blamable therefor in the contemplation of equity; that he ought to have moved before, if he desired the peculiar and discretionary relief which courts of equity afford. There must therefore have been knowledge, actual or imputable, of the facts, which should have prompted a choice either to diligently seek equitable relief or thereafter to be content with such remedies as a court of law might afford."

In this case, if the plaintiff did not have actual knowledge, she at least had imputable knowledge of the facts. Having knowledge that the estate was treated as insolvent, and failing and neglecting to make any of the numerous inquiries which would have put her in possession of all the circumstances, she will be deemed to have slept upon her rights, and cannot now be afforded relief.

In the case of *Bateman v. Reitler,* 19 Colo. 553, it is said: "If she was entitled to the portion owned by Robert Standring at the time of his demise she should have set up such claim; instead of doing this she waited nearly *four years* after the confirmation of the sale before asserting such claim. In the meantime a portion of the property had been deeded by the purchasers, and third parties had paid out large sums upon the faith of the order of the court. During all this time the purchasers had been in possession, presumably paying taxes upon the property, or otherwise it would have been sold for taxes. In this new country the value of city property fluctuates continually and parties claiming title thereto cannot be allowed, with full information, to remain silent

for years, while interested parties invest on the strength of a title apparently perfect. To allow plaintiffs in error to maintain this suit would be a manifest injustice and a fraud upon the rights of the defendants. By a familiar principle a party who is guilty of laches or unreasonable delay in asserting his rights must be denied equitable relief.''

In the case before the court, instead of waiting four years, as in the *Bateman v. Reitler* case, the plaintiff saw fit to wait for thirteen years, during which time she had permitted the defendant to treat this property as his own. He had donated to the public, in a manner which he considered would inure to the benefit of this property, upwards of $28,000. He had erected valuable improvements upon the property. He devoted the energies of the best years of his life to the upbuilding of the communities in which this property was situate, so as to make it valuable.

What is said in the case last cited as to the fluctuating value of property in this new country is peculiarly applicable to this case. For instance, about the time that Mr. Woodruff was appointed executor Mrs. French, one of the original plaintiffs in this action and an aunt of plaintiff Williams, wrote to certain citizens of Trinidad as to the value of this estate. They informed her that the entire property was worth but a few thousand dollars; that the lands known as the Powell canyon lands, being the same lands which were sold under the Hill trust deed, were worth from $1.25 to $2.50 per acre; yet we find sometime later that defendant sold a portion of these lands for $100 per acre, and it is said that at the time of the trial of this case they were again of but nominal value. So with the lands in Trinidad and in La Junta. Some years the prospects were bright and the lands would be worth considerable money; other

years there would be no market for them and they would be of but little value. This is but the experience of nearly all new communities.

Plaintiff may not sit by and watch the defendant treat the property as his own, sell it, exchange it, improve it, and expend his money for public improvement to enhance the value of the property until it becomes extremely valuable, and then say it belongs to her and his labor was vain. Having failed to speak when equity demanded that she should, she cannot now be heard when conscience demands that she be silent. True she claims that she did not have knowledge of these things, but she had the means of knowledge and, having had the means of knowledge, she will be considered as having had the knowledge itself.

In *Hagerman v. Bates*, 5 Colo. App. 402, Judge Bissell says: ''When the foundations of our system of equity jurisprudence were first laid by the learned lawyers and the wise judges who were its authors it was declared that whenever a party invoked the extraordinary powers of a court of equity to compel the specific performance of a contract he must proceed with both diligence and promptness. The absence of this diligence has long since become crystallized in the legal term 'laches,' which is incapable of an exact definition and dependent upon neither the lapse of time nor the force of those statutes which in actions at law determine generally the plaintiff's right. The defense of laches is in no sense dependent upon the statute of limitations. The lapse of time and the staleness of the claim are undoubtedly the governing considerations which control the application of this rule, but the parties are always held bound to proceed with reasonable diligence in the enforcement of their rights.''

Then, after reciting the facts, the court further says: "It may be truthfully said that for eight mortal years the plaintiffs failed to prosecute their action. There was a most notable absence of that 'conscience, good faith and reasonable diligence' which courts of equity always require."

It is true that this case was reversed in 24 Colo. 72 by this court, but the soundness of the doctrines of law as announced in the court of appeals was not disputed. The court found that there were sufficient facts to excuse the delay of plaintiffs in that action, and the case was reversed—not because of any error in the law announced by Judge Bissell, but because it was found that the delay was occasioned by matters which rendered the plaintiff excusable. No excuse is offered in this case except, forsooth, that the defendant had not advised the plaintiff as to his actions.

Whatever may be said as to the moral obligation resting upon the defendant, there was still a legal obligation resting upon the plaintiff whereby it was her duty to take some independent action for the purpose of supplying herself with such information as would lead her to a full knowledge of the facts.

The plaintiff, knowing that she was a devisee under the will, and learning that the estates of Rice in Iowa and Illinois were insolvent, and knowing that defendant was engaged in the settlement of the estate in Colorado, and that the estate here was insolvent, had sufficient knowledge to put her upon her inquiry to determine or discover what had become of this property. The slightest effort would have led her to the true situation. It was only necessary for her to inquire of her aunt, under whose roof she was then sleeping, to learn all that she could have learned at the time of the commencement of this action.

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property and of every claimant that he make known his claims. It gives to the actual and larger possessor security and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity and often bars the holder of a mere technical right which he has abandoned for years."—*Naddo v. Bardon*, 51 Fed. 493.

"The term 'laches' in its broad legal sense, as interpreted by courts of equity, signifies such unreasonable delay in the assertion of and attempted securing of equitable rights as should constitute in equity and good conscience a bar to recovery.  *  *  *  A learned judge has aptly and beautifully said that this power as exercised by the courts of equity is well symbolized by the emblem of Time, 'who is depicted as carrying a scythe and an hourglass, that, while with one he cuts down the evidence which might protect innocence, with the other he metes out the period when innocence can no longer be assailed.' No specific limit of time can be fixed within which the doctrine may be successfully invoked in courts of equity. It is not essential that such time should have elapsed as to make the statute of limitations effective.  *  *  *  A delay which might have been of no consequence in an ordinary case may be amply sufficient to bar the title to relief when the property is of a speculative character.  *  *  *  If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive, pre-

pared to affirm the transaction if the concern should prosper or to repudiate it if that should prove to his advantage."—*Graff v. Town Co.,* 12 Colo. App. 106; Kerr on Fraud and Mistake 306; *Williams v. Rhodes,* 81 Ill. 571.

"The question ordinarily is whether during the period of delay such changes have taken place in the position of parties relative to the subject-matter of the litigation as to render it inequitable to permit the enforcement of rights concerning which otherwise there might be no difficulty. If while the injured party is unnecessarily inactive * * * the other party, on the faith of an apparent situation, the reality of which he had no reason to doubt, has so changed his position that, if existing conditions were disturbed, he would suffer injury, the delay is chargeable as laches, and in equity the consequence of the laches is the loss of the remedy."—*Du Bois v. Clark,* 12 Colo. App. 220.

Measured by this rule, we find that defendant, relying upon his own good faith and believing that this property was his own, expended his time, energy and many thousands of dollars in the development of the section of country wherein the property was situate, with the purpose of making it valuable and his investment profitable. After he has succeeded in doing this and the plaintiff sat by silently for thirteen years, during the progress of this development, she ought not now to be heard claiming that this money, labor and energy were expended for her use and benefit.

"The plaintiff has slept upon his alleged rights. His opponent has long been allowed to possess and enjoy the disputed property without complaint. The controversy has probably been settled. The evidence has been lost or obscured. The plaintiff has sought advantage by delay. His action is an experiment.

There can be no justice or equity in his claim."— *Dunne v. Stotesbury*, 16 Colo. 89.

In *Manning v. San Jacinto Tin Co.*, 9 Fed. 737, it is said: "It must not be forgotten not only that the world 'moves on,' but that in this age and country and in this part of the country it moves rapidly. Three years now, and especially in California, is longer in events and progress than twenty years some centuries ago, when the statutes of limitations were adopted in England." (The same is true in Colorado.) "Parties cannot lie down to sleep upon their rights, and on waking up many years after find them in the same condition as that in which they were left. Even Rip Van Winkle, in a slower period and among a slower people, when aroused from his twenty years' slumbers in the recesses of the mountains, in the neighborhood of 'Sleepy Hollow,' found that the world had 'moved on.' * * * If the open, known, notorious facts suggested in the bill and apparent upon the records of the county did not in fact put the complainant and his grantor upon inquiry and lead them to a discovery of the frauds charged * * * they must indeed have been grossly neglectful of their own interests."

The above remarks are especially applicable to the case at bar. The thirteen years between the time when the plaintiff should have commenced to receive her semiannual interest and the beginning of this suit were big with progress in the counties in which this property was located. The world moved on in that locality; the repudiation of the trust, if there was a trust, was sufficiently open and notorious to put this plaintiff on notice; and she could not indulge in a Rip Van Winklean slumber during the thirteen years and then expect to wake up and find matters in the same condition in which they were left.

"The law of laches, like the principle of limitation of actions, was dictated by experience, and is founded in a salutary policy.  *  *  *  The rule which gives it the effect prescribed is necessary to the peace, repose and welfare of society. A departure from it would open an inlet to the evils intended to be excluded."—*Brown v. County of Buena Vista,* 95 U. S. 157.

In the case of *Young v. Cook,* 30 Miss. 332, the court says: "It may be said, however, that Shotwell was under the will a trustee, and that the statute does not run in such a case. This is true in regard to express trusts, and this may be deemed to be of that character. But it is only true so long as the character of trustee and *cestui que trust* exists. By the settlement made in March, 1845, both parties treated the trust as satisfied. The petition, however, says that the trustee divested himself of his character of trustee by fraudulent means. Admitting this to be true, the fraud, to avail the party, must have been such that he could not by the use of reasonable diligence have discovered it within the period prescribed by the statute. He could have made this discovery as well within one year after the commission of the fraud, by proper diligence, as in the time alleged in his petition."

That is true in this case. Suppose that Woodruff was a trustee of an express trust when he made his final settlement with the court in 1881 wherein he stated that the debts were still unpaid and there was nothing to satisfy specific legacies and of course nothing for residuary legatees. He repudiated the trust. The plaintiff knew of the making of this report, or had the means of knowing it. Everything that she has learned since 1891 could as well have been learned many years previous to that time.

"Numerous cases have been decided by this court where delay for a much less period than that fixed by the statute of limitations has been held to preclude the right of the party to bring the suit. In such cases it is said courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, the prosecution of the suit; and no general rule can be laid down for the guide of the court in every case."—Kerr on Fraud and Mistake (Bumps ed.) 306; *Williams v. Rhodes,* 81 Ill. 571.

Conceding what is contended for by the counsel for plaintiff that time does not run against an express trust, it must be borne in mind that this rule is subject to the qualification that when the trust is repudiated by clear and unequivocal words and acts of the trustee who claims to hold the trust property as his own, and such repudiation and claim are brought to the notice of the beneficiary in such a manner that he is called upon to assert his equitable rights, or he has sufficient information to put him upon his inquiry, time will begin to run from the date such repudiation and claim or information which would have led to the discovery came to the knowledge of the beneficiary.

Again, it is said by another court: "It is true, as a general rule, that when the relation of trustee and *cestui que trust* is uniformly admitted to exist and there is no assertion of adverse claim or ownership lapse of time can constitute no bar to relief. But where the trust relation is repudiated or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance in all such cases a court of equity will refuse relief on the ground of the lapse of time and its inability to do complete justice."— *Nettles v. Nettles,* 67 Ala. 599.

In *Buckner and Stanton v. Calcote,* 28 Miss. 599, it is said: "In the present case there was a lapse of about eleven years, according to the statements of the bill, before any efforts were made to investigate the alleged frauds, when from their nature as stated they were open to detection all this period of time. It would be dangerous and mischievous in the extreme to sanction a rule that would under such circumstances permit transactions so long acquiesced in and involving immense interests not only to the parties directly implicated but in all reasonable probability to innocent persons whose rights are connected with or dependent upon them to be set aside and annulled without the clearest equity shown by the complainant and the absence of all laches."

In the case of *Hammond v. Hopkins,* 143 U. S. 244, it appears that the trustee purchased, as charged here, through an intermediator at his own sale, and that court through the chief justice said: "Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like."—*Marsh v. Whitmore,* 21 Wall. 178; *Landsdale v. Smith,* 106 U. S. 391; *Norris v. Haggin,* 136 U. S. 386; *Mackall v. Casilear,* 137 U. S. 556; *Hanner v. Moulton,* 138 U. S. 486.

If it is claimed that because the plaintiff resided at a great distance from the scene of the transaction she necessarily remained in ignorance

of many of the facts which were open and notorious to the people residing in the vicinity, this will not avail her, because it has been determined that absence does not excuse laches.

Absence of itself is no excuse. Travel and communication are easy. If she could not and did not care to go to the location of the property she could easily have written and ascertained exactly what was being done with it and with equal ease could have given notice of her claim. There cannot be one law of laches for the resident and another for the nonresident.—*Naddo v. Bardon,* 51 Fed. 496.

In the case of Broderick's will, 21 Wall. 503, it is said: "They do not pretend that the facts of the fraud were shrouded in concealment, but their plea is that they lived in a remote and secluded region, far from means of information, and never heard of Broderick's death or of the sale of his property or of any events connected with the sale of his estate until many years after these events had transpired. Parties cannot thus, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the past. The world must move on, and those who claim an interest in persons or things must be charged with knowledge of their status and condition and of the vicissitudes to which they are subject."

While it may be true that the defendant has dealt with this estate in a manner prohibited by law, upon which subject we express no opinion, yet from the careful investigation which we have made of this record we cannot find that the plaintiff is in a position to complain. The authorities cited in this opinion are enough, and more than enough, to prohibit us from granting her relief. The judgment of the lower court will therefore be reversed, and the

cause remanded with instructions to dismiss the bill at plaintiff's cost.                    *Reversed.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE GODDARD concur.